(No. 23153.—

*In re* LUCIUS J. M. MALMIN and C. W. LARSEN, Attorneys, Respondents.

*Opinion filed June 10, 1936—Rehearing denied October 13, 1936.*

CHARLES LEVITON, *amicus curiæ.*

FERDINAND J. KARASEK, JOHN F. LAX, and LUCIUS J. M. MALMIN, *pro se,* for respondent Lucius J. M. Malmin; C. W. LARSEN, *pro se,* respondent.

Per CURIAM: The board of managers and the committee on grievances of the Chicago Bar Association, acting as commissioners of this court and authorized by our

order of April 21, 1933, to investigate complaints against members of the bar of this State, have conducted hearings upon the complaint of Harold L. Ickes against Lucius J. M. Malmin and C. W. Larsen, attorneys. Voluminous reports of the testimony and proceedings have been filed herein, together with the recommendation of the commissioners "that the respondents, Lucius J. M. Malmin and C. W. Larsen, be disbarred and their names stricken from the roll of attorneys."

While the issues are primarily questions of fact, both respondents devote large portions of their briefs and arguments to an attack upon the jurisdiction of this court, saying that under the order of April 21, 1933, the commissioners were only an investigating body in the nature of a grand jury; that proceedings in disbarment can begin only with the issuance of summons or process out of this court after leave has been granted to file an information; that the unsworn complaint filed against them was insufficient to confer jurisdiction, because it was not signed by the Attorney General, State's attorney, president and secretary of any regularly organized bar association; that the commissioners were without authority to conduct the hearings before charges were preferred in this court, and that the proceedings were otherwise irregular and insufficient. These points indiscriminately relate to a course of procedure still available under that part of rule 59 which provides for the filing of informations in disbarment proceedings. The case of *In re Ranson*, 358 Ill. 227, cited and relied upon by respondents, was such a case, the procedure there being by information. But the alternative mode of procedure followed in the case at bar and prescribed as an additional means of discipline by our order of April 21, 1933, has been approved and followed in so many recent decisions, (*In re Zahn*, 356 Ill. 283; *In re Borchardt*, 357 id. 458; *In re Lasecki*, 358 id. 69; *In re Grosso*, 359 id. 243; *In re Casey*, 359 id. 496; *In re Horwitz*, 360 id. 313; *In re*

*Mack,* 360 id. 343; *In re Kolb,* 362 id. 190;) that the sufficiency of such proceedings to confer jurisdiction is no longer a debatable subject.

A further contention affecting jurisdiction and procedure is, that it was the duty of the complainant to follow the case, and that John L. Fogle and his successor, Charles Leviton, as *amici curiæ,* were each without authority to act in the capacity of prosecutor or to file pleadings except by permission of the court, and this not having been obtained, the complaint has been abandoned and there is nothing before the court. Here, again, respondents have failed to notice that portion of the order of April 21, 1933, which provides that the commissioners shall, if action of any kind is recommended, make report to this court of its conclusions of fact and law concerning the complaint, answer and proof, and that such report shall be entered on the docket and entitled in the name of the respondents. This provision indicates that the procedure is not a strictly adversary proceeding, but that the case is docketed in the name of the respondents for purposes of investigation. The order further recites in what manner the respondent shall file his exceptions, record, abstract and brief, and then states: "Upon the filing of exceptions to such report by the respondent, the board of governors or the board of managers, as the case may be, shall designate a member of the bar to file certificates of proof, additional abstracts and briefs as may be determined necessary fully to advise the court." From the language in the order it will be seen that no necessity exists for the original complainant to follow the proceedings into this court but that a member of the bar designated by the board of managers, as was *amicus curiæ* in the present case, may properly present the matter to this court.

The complaint charging respondents, Malmin and Larsen, with professional misconduct was filed with the grievance committee of the Chicago Bar Association on March 24, 1934. Notices thereof, together with copies of the

complaint and copies of the order of this court of April 21, 1933, were duly served upon both respondents, who filed their respective answers and requested that the hearing be public. Accordingly, on June 5, 6 and 7, 1934, public hearings were held in Chicago, attended by all the parties interested and their respective attorneys. Malmin and Larsen each testified in his own behalf, while in support of the complaint, six witnesses, including Ickes, testified orally and the depositions of five others were read and filed, with numerous exhibits. The complaint covers ten pages of the printed abstract, with some thirty-four different specifications of fact and charges. After detailing a series of events relating to the settlement of an estate by Ickes prior to his appointment to the President's cabinet as Secretary of the Interior, it charges, in substance, that Malmin and Larsen had engaged in a conspiracy to attack the reputation of Ickes for personal gain to themselves; that they trumped up a pretended case of fraud against him in an effort to intimidate him, and expressed their willingness to suppress the publication or use of his supposed fraudulent conduct in return for political appointments to official positions. The answers of respondents in equal length and detail deny the various charges made against them.

Malmin was licensed to practice law in this State in 1885, and Larsen in 1915. Larsen was suspended from the practice of law for a period of three months from October 24, 1934, and until the further order of the court. (*In re Larsen,* 358 Ill. 103.) An examination of our own records discloses that no further order has been entered re-instating him.

The proof shows that in August, 1928, Ickes was retained by Dr. Roland P. Saunders, of Chicago, as attorney for the estate of his deceased brother, Clarence A. Saunders. The heirs-at-law were Roland P. Saunders, brother,

and Margaret Belle Saunders, sister of the deceased. The estate consisted of personal property in Illinois and Minnesota and personal and real property in California and North Dakota. The total value of the personal estate was $12,469.74. The real property in California had an appraised value of $11,000. This latter value was disputed by Larsen, who contended that the assessed value for taxation was only $4000. The value of the North Dakota real property was unknown. Ickes received $1000 for services rendered in the estate and $352.84 for services and costs in the North Dakota matters. The final account and report of all fees and costs incurred and paid by the administrator of the estate was approved by the probate court of Cook county and the estate was closed in 1930. The record shows no payments to Ickes of any other money out of the Saunders estate, and his sworn testimony to this effect stands uncontroverted.

In May, 1928, about three months before Ickes was retained as attorney for the Saunders estate, one Marshall Stimson, an attorney in Los Angeles, wrote to Ickes advising him that Saunders' property in California had been sold for taxes and suggested that for a contingent fee of fifty per cent of the proceeds of the sale of the real estate, he would be willing to take action to clear the title thereto. This offer was communicated to Dr. Roland P. Saunders by Ickes, and after some correspondence Stimson undertook the matter of a modified contract of $500 retainer and a contingent fee of one-third of the proceeds of the appraised value of the lots if he should succeed in redeeming them. This contract was carried out. The lots were redeemed, appraised, Stimson's fees paid and the title to the lots vested in the Saunders heirs. No additional charge was made by Ickes for this service. The final account in the ancillary administration in California for a period ending June 2, 1930, was duly approved, and the Saunders estate was closed in 1930 in both jurisdictions.

In the latter part of 1931 Larsen appeared at the Ickes law offices in Chicago and met Austin Hall, a lawyer associate of Ickes. · Larsen stated that he wanted to talk to someone about the Saunders estate. Hall said he had handled the estate in the probate court and perhaps could talk to him about it. They went into Hall's office, where Larsen wanted to know why the Los Angeles lots had been redeemed from tax sale. Hall said that Larsen probably wanted to talk to Ickes, who then came from his private office and the conversation was continued in the reception room by the three lawyers. Larsen said he was interested in the case against attorney Stimson of Los Angeles who had redeemed the California property. Here occurs the only conflict in the testimony as to the original conversation of Larsen with Ickes. Larsen testified that in December, 1931, or January or February, 1932, he first talked to Ickes and that after a talk with Hall he saw Ickes alone in what he presumed was the latter's private office. He also stated that Hall could not hear the conversation which he, Larsen, had with Ickes. Larsen's claim that Hall was not present at the initial conversation with Ickes is not material, because neither in his testimony nor in his brief does he deny Ickes' version of this talk. Larsen told Ickes "that he had examined the probate court files in the probate court of Cook county, Illinois, and that there was absolutely no complaint or criticism against Mr. Ickes; that he, Larsen, was interested in the case against Mr. Stimson." During the course of the conversation Larsen asked to see the files in the Saunders estate, and they were brought in by Hall. Thereupon Ickes directed Hall to go through the files with Larsen and get him any information he wanted. Larsen stated that he did not wish to do so at the time but wanted to take the files to his own office. Ickes replied he would not permit his personal files to be taken from the office but that Larsen could go through the records in the probate court. In answer to a query concerning the value of the

California lots, Ickes said that the present valuation, following the crash in 1929, was much less. Ickes also told Larsen that the fee charged by the California attorney had been retained in its entirety by him, and that he, Ickes, had received no compensation whatever for the California part of the estate. Larsen testified that he told Ickes, among other things, that Dr. Saunders and a sister, Margaret Belle Saunders, of Massachusetts, were dissatisfied with the cost of handling the estate in California, but no mention is made of this in Larsen's brief and no point is based upon this testimony.

Following this conversation, in December, 1931, or in January or February, 1932, nothing further was heard from Larsen by Ickes until the morning of February 17, 1933, when the newspapers contained the announcement of the appointment of Ickes to the position of Secretary of the Interior. On the same day of the press announcement that President-elect Roosevelt had invited Ickes to become a member of his cabinet, Larsen again came to Ickes' office and served a notice of the filing of a petition in the probate court attacking Ickes' conduct in the Saunders estate. This petition was informal, was not signed by the heirs of the estate but was signed by Larsen himself as attorney for Margaret Belle Saunders and was sworn to by an employee or associate in Larsen's office. The petition purported to be by Margaret Belle Saunders, who at that time was a non-resident, and made Dr. Roland P. Saunders a defendant thereto, charging Ickes and others with a conspiracy to defraud Margaret Belle Saunders in the Saunders estate. When the petition was presented in the probate court, Judge Taylor told Larsen that the petition contained scurrilous statements about certain persons, that it was not signed by the non-resident complainant, Margaret Belle Saunders, and that since it was informal and improper it would not be entertained by the court. Larsen stated they would have the petition verified by Margaret Belle Saunders and pre-

sented within two weeks. Neither this nor any other petition on the same subject was ever subsequently filed in the probate court. Immediately thereafter, at the request of Ickes, an investigation of the entire matter was made under the direction of the State's attorney of Cook county by Grover C. Niemeyer, then chief assistant State's attorney, now judge of the superior court of Cook county. At the conclusion of this investigation Ickes was informed by Judge Niemeyer and State's attorney Courtney that no irregularities were shown by such investigation and that Ickes should pay no further attention to the matter.

At about the same time, respondent Malmin appeared and introduced himself to Ickes and stated that he, Malmin, was to be the next Governor of the Virgin Islands. Subsequently Larsen prepared a new petition addressed to the probate court of Cook county and also prepared a complaint addressed to the Chicago Bar Association, in which petition and complaint Ickes was charged with unprofessional conduct in the Saunders estate. The petition to the probate court bears the signature of Margaret Belle Saunders and appears to have been sworn to by her on May 25, 1933. The complaint to the Chicago Bar Association is dated June 9, 1933, and is signed by Larsen. The petition was never presented to the probate court and the complaint was never filed with the Chicago Bar Association. Both of these documents were introduced as exhibits and are shown in the record. Between March 4 and July 13, 1933, Larsen and Malmin had a number of conferences in which the subject matter of the petition and the complaint against Ickes was discussed. In their testimony before the commissioners they both admitted that these discussions were had, and that Larsen gave to Malmin the petition to the probate court and the complaint addressed to the Chicago Bar Association, with the understanding that Malmin would take them to Washington in the early part of July, 1933, and there get some sort of settlement out of Ickes.

On July 13, 1933, Malmin appeared in the office of the Secretary of the Interior, spoke to Harry Slattery, his personal assistant, and asked for an interview with Ickes. Upon being told that Ickes was then out of his office, Malmin told Slattery that he had been given the "run-around;" that his name was Judge Lucius Malmin and that he was a candidate for the governorship of the Virgin Islands; that he had some documents he thought the Secretary would want to see. Slattery testified that Malmin explained how much he had done for the Roosevelt administration and that he had a great deal of backing; that the Secretary of the Interior had it in his power to take him to the President; and that Malmin had some documents with him which he thought were of much importance to Ickes. He said Malmin then produced a press statement and showed Slattery another document headed "Prayer and Petition for Disbarment of Harold Ickes." Slattery testified that Malmin then said, "I am going to leave to-night for Chicago. If I don't hear about this appointment, I will give out this press statement and give out the disbarment proceedings when I return to Chicago." During the examination of Slattery, Malmin produced the complaint signed by Larsen, addressed to the Chicago Bar Association, dated June 9, 1933, and Slattery identified it as the document shown him by Malmin at the time. While Malmin's version of the discussion with Slattery differs somewhat, most of Slattery's testimony in its essential features is uncontradicted. Malmin testified that Slattery did not see the inside of the complaint, but only the outside, and further said that at this interview he mentioned the Saunders estate only casually and made no threats of any kind. Upon Ickes' return Slattery told him of the conversation he had had with Malmin, and suggested that he should see him, and to this Ickes agreed. Later in the same day, Slattery called Malmin and told him he could then see Ickes if he would return to the office. On his reports that threats had been made, Ickes

stationed witnesses in his office to overhear the conversation, and Malmin in due time arrived. Malmin's testimony as to their conversation differs from that of Ickes, but the latter is corroborated, in substance, by the testimony of the other witnesses. One of these witnesses was Theodore Mack, personal stenographer for Ickes, who has resided in Washington for forty years and has been personal stenographer for secretaries Lane, Payne, Fall, West, Work and Wilbur. Another was Louis R. Glavis, director of investigations for the Department of the Interior. Both of these witnesses secreted themselves near by where they could overhear the conversation. Ickes testified that Malmin asked him for an introduction to the President; that he replied that such appointments were made only by Colonel McIntyre; that Malmin then said he was unable to get McIntyre to make an appointment for him, whereupon Ickes stated that if McIntyre would not make the appointment, Malmin was "out of luck," and he, Ickes, would not arrange it for him. In further relating their conversation, Ickes testified that Malmin said that Larsen contemplated proceedings before the bar association and in the probate court, which would make it impossible for him, Ickes, to remain a member of the cabinet and that he, Malmin, had labored diligently day and night trying to prevent Larsen from filing the proceedings. Ickes stated that as far as Larsen was concerned, he could "go to hell," that he had never submitted to blackmail and did not propose to begin then. Malmin replied that if he were appointed Governor of the Virgin Islands the whole thing could be amicably settled. Nothing was said about the Saunders estate, but Malmin indicated that the contemplated proceedings would be damaging to Ickes and would be filed unless Malmin was endorsed by Ickes for the appointment. In his testimony, Malmin denied that he suggested to Ickes or anyone else that if he or Larsen was

given any particular public office the charges which these petitions set forth would not be investigated.

Soon after this visit of Malmin to Washington, the Department of Justice of the United States made an investigation of the matter and sent two of its investigators to Chicago. As a final result of this action, Malmin and Larsen both signed statements, which were offered in evidence before the commissioners, in substance withdrawing any charge of misconduct against Ickes. This investigation was completed and the statements were signed by Malmin and Larsen about the middle of September, 1933. In Larsen's statement, dated September 20, 1933, he says that he was misled as to certain material facts in the Saunders estate which were withheld from him by his clients and that being so misled he, Larsen, unintentionally misled others; that because of the erroneous and misleading information above referred to he declined further to represent either of the heirs of the Saunders estate; that he would promptly notify both heirs of his withdrawal as counsel and that in his opinion the actual facts differed from the supposed facts; that he would refrain from presenting the contemplated charges to the Chicago Bar Association involving the attorney for the administrator of the Saunders estate and that he would not file the petition in the probate court of Cook county or in any court at any time, and that he would not suggest, persuade or assist in any attempt to re-open the estate at any time; that he is the original and only professional representative in the matter; that he prepared the proposed complaint to the bar association, also the petition to the probate court and that no other person assisted him in preparing such documents; that the statement is made after consultation with his clients and after full consideration by them and as an "honorable amend to all concerned." In his brief filed herein Larsen also states: "No testimony can be found in this record given by any witness that respondent Larsen ever at any time authorized, con-

doned, or acquiesced in the tactics and methods used by respondent Malmin, where it clearly appears that he undoubtedly took advantage of the claim in furtherance of his personal interest, to-wit: procuring the governorship of the Virgin Islands."

Malmin, in his statement dated September 16, 1933, indicates that he is pleased to have the Department of Justice undertake an investigation of the matter and says that "since last June I have held the matter in abeyance and I am only too glad now to be relieved of the matter and to have it in the proper hands for solution," and that from the moment of the signing of the statement "I have severed all connections with and have no interest in the matter."

Respondent Malmin received no appointment to office. On February 13, 1934, Malmin wrote, and sent by mail to Hon. James A. Farley, Post-master General of the United States, a letter, in which he said, among other things: "You are not alone in your indifference. The President is likewise. My letters to him, though addressed to him, care of his daughter or his wife, remain unanswered. Now it may be he feels piqued because of my attempt last fall to call his attention to an Ickes indiscretion, which I whitewashed for him. Be that as it may, you know from experience that whitewash easily washes off, leaving the place applied as naked, bare and repellent as before the application of the whitewash. I am having trouble holding the attorney in the case in line. The statement that was written and directed to me for use as I saw fit was written to relieve the President from possible embarrassment, and though I may have relieved the President, and incidentally Ickes, whatever embarrassment there has been has come my way, and my friend, the original attorney in the case, who ceased his activities, now reasons that inasmuch as I have not had the slightest recognition from the President or anyone else, the matter might just as well be stirred up again. This of

course must not be construed as a threat, but to be considered merely a possibility."

Soon after sending this letter to Farley, Malmin again went to Washington. The record shows that at that time Malmin attempted to secure the publication of articles in the newspapers exposing Ickes' supposed derelictions in connection with the Saunders estate, and had offered such story to LeRoy Vernon, of the *Chicago Daily News,* and John Boettiger, of the *Chicago Tribune.* The filing of the complaint by Ickes against Malmin and Larsen followed shortly after Malmin's letter to Farley and his visit to Washington about the middle of March, 1934.

In the view we take of this proceeding, we are not concerned with the record in the Saunders estate, nor with the charges of conspiracy or blackmail against the respondents. This is not a criminal case, with its formalities of pleading and burden of proof, but is an investigation of respondents' conduct to determine whether they shall be disbarred or disciplined. (*In re Sanitary District Attorneys,* 351 Ill. 206.) While respondents in such proceedings have the full right to examine witnesses and the charges must be sustained by competent evidence, we have never held, as contended by respondents, that the rules of evidence applicable in criminal cases would prevail in disbarment proceedings and thus require proof of their misconduct beyond a reasonable doubt. (*People* v. *Stonecipher,* 271 Ill. 506.) The accepted rule is, that in any disbarment proceeding, whether the misconduct charged amounts to a crime or merely to unprofessional conduct, the charge must be proved only by clear and convincing testimony. *People* v. *Kerker,* 315 Ill. 572, and cases therein cited.

After reviewing the record we are convinced that the conduct of respondents Malmin and Larsen was unprofessional and dishonorable. Their disclaimer of improper motives and methods used to obtain either a money settlement out of Ickes, as Larsen says he sought, or the political

preferment desired by Malmin, is not borne out by the evidence. In many important respects especially damaging to their contentions, their own testimony and their sworn statements of retraction entirely corroborate the adverse testimony in proof of their unprofessional activities. Whether Malmin neglected Larsen's interests in his conference with Ickes, or went beyond proprieties in his discussions with Ickes, Slattery, Boettiger and others in Washington, or afterwards re-opened the breach with veiled threats in his letter to Farley is immaterial—the above described use of documents, ostensibly prepared for filing in a judicial forum to secure either money or political attention, is not only highly unethical and unprofessional but is to be condemned as contrary to public morals and decency. Neither inexperience, personal grievance, nor advanced age will excuse such conduct of one member of the bar against another, nor can it properly be said that activities of this sort are essentially of a private nature, entirely divorced from respondents' official capacities as attorneys at law.

Malmin's use of the petition and complaint furnished him by Larsen in an attempt, by threat of a public scandal involving the Federal administration, to secure an appointment for himself, is clearly established by the evidence and warrants his disbarment. His letter on the same subject to Post-master General Farley, even without the other corroborating evidence, gives convincing proof of his motive in this regard.

As Larsen now stands suspended from the practice of law by a previous order of this court, it is unnecessary to enter any disciplinary order against him.

The report and recommendations of the commissioners are approved as to respondent Malmin and he is disbarred from the practice of law and his name is ordered stricken from the roll of attorneys of this court.

*Respondent Malmin disbarred.*