(No. 26048.—

IN RE PHILIP H. GOODMAN, Attorney, Respondent.

*Opinion filed June 13, 1941—Rehearing denied September 10, 1941.*

CHARLES LEVITON, *amicus curiae.*

STANTON & STANTON, for respondent.

Mr. JUSTICE SMITH delivered the opinion of the court:

A report of the board of managers and the committee on grievances of the Chicago Bar Association, as commissioners of this court under rule No. 59, recommends the disbarment of Philip H. Goodman, an attorney, on the grounds of unprofessional, unethical and dishonorable conduct, denoting a lack of good moral character. The specifications of the complaint concern occurrences during the months of August, September, and October, 1939, in connection with the arrest, detention and trial of certain persons named therein on sex charges. Respondent is charged with extortion, attempted extortion, soliciting law business by duress, under circumstances amounting to duress, and conspiracy with the police officers, lock-up keeper and per-

sons unknown to blackmail and extort money from the persons arrested. He filed exceptions to the report and the cause is taken on the record and proofs.

Respondent was admitted to the Illinois bar in April, 1924. He lives at the Carlton Hotel at 1517 South Michigan avenue in Chicago. His brother Danny operates a tavern at 1212 South Wabash avenue. The hotel and the tavern are in the near vicinity of the police station at 1121 South State street. Respondent was raised in its neighborhood. He follows the practice of criminal law, which has not been lucrative to him in the past few years.

A chiropractor, of Kansas City, Missouri, and a truck driver in the employ of Greyvan Lines, operating in the United States, Canada and Mexico, were arrested in the afternoon in a toilet in Grant Park on a charge of homosexuality, by plain clothes officers Edward Hickey, Francis W. O'Malley, Elmer Johnson and Wm. J. Kearney, of the Chicago police force, assigned to the first district, in which the police station mentioned is located. The men arrested were strangers to each other. Grant Park lies between Michigan avenue and Lake Michigan. The toilet is approximately one quarter of a mile south of the Field Museum, which is also in the park. There is another toilet nearer the Field Museum.

The truck driver testified he loaded his truck in Evanston at noon, drove to Chicago, parked his truck, went to the Municipal Pier to see about the purchase of a new trailer, and from there cut across the park to deliver some money to the Greyvan Lines at 1338 South Michigan avenue; that he had $400 in cash; that he wanted to find a toilet and saw the one where the arrest was made; that he entered and had scarcely sat down when O'Malley came in, arrested him and took him and another man, whom he learned was the chiropractor, to the police station, where he asked leave to call Greyvan, but was asked by the officer at the desk if he had any money, and upon his affirmative reply, was

placed in a cell, his money being taken from him; that he asked the jailer if he could contact Greyvan or its legal department, but the jailer just laughed and said there would be a man to see him afterwhile; that in about an hour he raised a disturbance and told the jailer he wanted to get out and had money if that was what he wanted; that the jailer again said there would be a man to see him; that respondent came about 8:00 or 9:00 o'clock that night and told him he was in an awful spot, but did not answer when asked how he found it out; that respondent told him he could do him some good but it would cost him some dough; that he told respondent he was not guilty, and respondent replied he wanted to see the man arrested with him; that on respondent's return he said the chiropractor was stubborn and he did not think he could do much with him; that he had no dough anyway and was not able to raise any; that respondent asked him how much he could spare and if he would be willing to leave what he had downstairs in the office; that he asked respondent how he knew he had any there, but respondent did not reply and went out for awhile; that O'Malley then profanely accused him of an offense in the toilet, which he denied, and said he would plead not guilty; that O'Malley told him he would not get out that way and there was only one man that could do him any good, and the man would put him on the street but it would cost him some dough; and that if he was going to be stubborn it would be an awful mess, but if he would go along with them he could get out that night; that he told O'Malley he had to get out; that his equipment, worth $6000, was on the street unguarded, in violation of the rules of his company and its bonding company; that in a little while respondent came back; that they would not allow him to telephone Greyvan; that respondent told him he had seventeen years of political influence and could get him out, but it would cost plenty of dough, and induced him to agree to pay $200 in cash and to sign a note for

$200; that he was then taken downstairs, where the man in the front office gave respondent $200 of the money, and had him sign a bond; that he saw respondent hand the jailer some paper money; that he was taken to a nearby bond office, followed by O'Malley and another policeman, where he signed a note for $200, after which respondent nodded to the officers and they left; that respondent told him to go about his work and forget the whole thing; that he did not want him to appear in court, but that he would take care of everything and nobody would ever know the difference; that the next morning respondent called him at the Greyvan office, told him something awful had happened and to come down and get it straightened out; that when he went to the station he was fingerprinted and photographed, and when he came down O'Malley had his arm on respondent's shoulder; that respondent again told him he would take charge of his case and see that he did not have to appear and there would be nothing to it, provided he paid the note; that he did not know the date of the trial and did not appear. The chiropractor was defended by another lawyer. Respondent appeared at the trial of both the parties arrested but took no part in the proceedings, although there was a plea of not guilty on file and he had been hired to defend the truck driver. Each of the defendants was fined $25.

The chiropractor testified before the commissioners he had been to the Field Museum, and as he passed the toilet he had a peristaltic pain and felt he could not reach a hotel; that he was arrested about five minutes after he entered the toilet; that about 10:00 o'clock that night the jailer informed him a man wanted to see him; that respondent appeared, said he was an attorney, and was there to help him; that he had not called for an attorney and was not permitted to use the telephone; that he told respondent he was not guilty and respondent replied it would be awfully hard to make the judge believe his story because the officers

do not deliberately accuse men of something they did not do; that if he was guilty he could get him out of it, but it would cost him some money; that if he was innocent he could not help him; that he asked respondent who sent him there and respondent replied they would not go into that now; at his request respondent agreed to call a nurse acquaintance to see about making bond, but did not do so, and he did not see him again until the day of the trial; that the cause was continued one week on account of the truck driver's absence, with the judge's permission to telephone about bond; that he immediately tried to call the nurse without success, and that the jailer refused to allow him to call again, remarking that he, and not the judge, was handling him then. At the hearing before the commissioners, each of the parties arrested denied the offense.

Police Captain John I. Howe testified he made an inspection of the toilet and that it was impossible for O'Malley and Hickey to have seen what they claimed they did see through the knot hole and window as testified by them; that Grant Park is policed by its own force of 764 men, with its own detail on sexual offenses, and that the arresting officers had no business to go into the park, and that is the reason they were discharged; that when a city police officer finds himself in the park, he is permitted to make an arrest there, or anywhere in the city if the offense is casual and committed in his presence, but city police are not authorized to go into the park or another district to look for arrests; that the rules of the police department require that when persons, not known criminals, are arrested, they shall be immediately permitted to communicate with friends or relatives; and that the steps he had taken to stop attorneys from visiting prisoners before they were booked comprised the suspension in this particular instance of six policemen, six lock-up keepers, the retiring of two more, and the discharge of four policemen.

O'Malley testified he did not remember the truck driver or the arrest of the chiropractor; that he knew respondent by sight but had never met him; and that he did not know there were park police not considered to be city police. He and Hickey both admitted they had made a good many arrests in the park without having "tailed" the parties arrested. Hickey testified he was not acquainted with respondent. He admitted he knew the park was patrolled by the park district police. He denied he ever had any occasion to discuss the case with respondent, but respondent testified Hickey asked him to telephone the truck driver to come back to have his picture taken.

Respondent testified he did not know the truck driver before the arrest; that he was informed of it at his brother's tavern but did not remember whether his brother or the bartender called him; and that when he took the fee he told him that he did not know what he would be charged with. Yet he procured his release on bond, although admitting that a prisoner not booked could not be so released. He later admitted he knew the charge was "lewd and licentious conduct" when the bond was made. He also testified he never knew and had never seen Hickey; that he forgot to telephone the nurse at the chiropractor's request; that the truck driver admitted to him that he had "committed an act" but that the officers did not catch him. The truck driver denied making any such statement. Respondent further testified he and the truck driver went alone to the bond office where the note was made; that he told him he had asked someone to call Danny Goodman's brother because he had heard from other Greyvan drivers that he was a lawyer; that the $200 was paid by the truck driver and not by the officer.

Although a plea of not guilty was entered, respondent admitted he did not insist that he should come to the trial, and testified they had an arrangement that if he could not

come, respondent would take an *ex parte* hearing. Paul Thurlow, an attorney, testified he heard respondent tell the lawyer representing the chiropractor that he knew the truck driver very well and had known the police officers a long time. The above evidence is set out at some length because in its essentials it is, in many respects, typical of the other cases.

The evidence shows that similar tactics were used when a man from New York City was arrested on a charge of making indecent advances to a police officer in a moving picture theatre. He had never been arrested before. He was held *incommunicado* until respondent appeared, procured $20, all the money he had, and took his diamond ring as a pledge for the balance of his fee of $150. He was admitted to bail. It appeared he was intoxicated and knew nothing about the alleged indecent advances. The arresting officer agreed to tell the judge he was picked up for being intoxicated. He did so and he was discharged. Payment on a money order for $75 which was sent from New York to apply on the fee was stopped, and the ring was returned by respondent after demand of a New York lawyer.

Another man, engaged in the advertising business, was also arrested in a moving picture theatre on a similar charge concerning a sixteen-year-old boy. He, too, was intoxicated, held *incommunicado* until respondent came, and was paid $50 for his fee and $15 for bond. He had never been arrested before, and was so intoxicated he could hardly walk and was dragged out by two ushers. The next day a man sent by respondent defended him. He was fined $10 and costs and placed on probation.

On another occasion a business man with a lady friend, another man, his wife and mother-in-law, drove to a tavern at Seventh street and Wabash avenue at night. The last three mentioned went into the tavern. The two who remained in the car were arrested by three officers and held

*incommunicado* until respondent appeared and told the man arrested that he was in a "hell of a shape" and it would cost him a lot of money, $200. He asked respondent what for, to which respondent replied it was the word of three against one and they could hang anything on him they desired. He had $20, which he gave respondent, agreeing to pay him $50 the next day and give a note for $25, payable in two weeks, for defending both of them. Respondent finally settled with him for $85. On the trial one of the police officers testified they were pretty drunk and he locked them up for their own safety. The judge criticized the officer for arresting people one day and coming in the next day and defending them. Neither of these parties arrested authorized anybody to call respondent. They were discharged by the court.

Two men were arrested late at night while standing on a street corner waiting for a bus, after having visited several taverns. They were likewise held without an opportunity to communicate with anybody. Respondent appeared and after talking with them, telephoned the wife of one of the men arrested. He told her to meet him at the bond office at 1107 South State street, and that his fee would be $50, and the usual bond was $100. She did not meet him, but employed another attorney, and went to the police station with relatives, where respondent criticized her for not coming to the bond office and urged her to employ him. He said he was doing her husband a great favor and his fee would be $75. The other man arrested, who had ready cash, had already paid respondent $125, was released, and did not appear at the trial. Respondent told one of them they were held on a sex charge. One of them was represented by another attorney, was fined $1 and costs.

Respondent denied much of the material testimony of the witnesses, but their evidence appears credible and was not shaken on cross-examination.

None of the parties arrested sent for respondent and none of them had ever heard of him prior to their arrest. Holding them without opportunity to contact relatives or friends was a direct violation of the police regulations. Respondent's testimony that he was called from his brother's tavern or by notes of the hotel clerk in no way tends to show the police did not send for him through those sources. The undisputed evidence shows they held the prisoners *incommunicado* until respondent arrived. Nobody else, so far as the record shows, had any initial opportunity to know of their arrest, and respondent was unable to name anybody who sent for him on any of the cases. The conclusion that the police officers did so is sufficiently shown by the evidence. His conduct shows he exacted fees from the persons arrested under circumstances amounting to intimidation and extortion.

The claim that the hearing by the commissioners amounted to an attack on the judgments of the court in the several cases is without foundation. Whether the parties were or were not guilty of any offense has no bearing upon the effect of the evidence which clearly and convincingly shows respondent was guilty of obtaining fees from them under circumstances amounting to duress. The record sufficiently shows that he and the police officers and the jailer were in a conspiracy to that end. The facts proved are sufficient to warrant disbarment. *In re Malmin,* 364 Ill. 164.

While respondent was not shown to be present, except in one instance, when the prisoners were denied the right to communicate with anybody, the evidence that they were so denied was admissible on the conspiracy charge. Respondent's contention that it was improperly admitted is without merit. So, too, is his claim that the specifications were vague and uncertain. They set out in detail the acts complained of and proven.

Respondent urges that because all of the six commissioners were not present at all of the hearings he was illegally deprived of their arguments, judgments and experience.

The rule of the commissioners, adopted under rule No. 59 of this court, provides that the committee or any division thereof, or the chairman or vice-chairman, may in his discretion direct a hearing before the committee, or division thereof, or any member or members of the committee. There is no showing and respondent does not claim the hearings were not conducted in compliance with the rule. Moreover, he made no complaint at the hearings about the personnel of the committee.

The fact that several witnesses testified to respondent's good reputation is not sufficient to overcome the positive testimony of his unlawful conduct. While this court will not disbar an attorney where there is a substantial doubt as to his guilt, no such case is presented here. On the contrary, respondent attempts to justify his methods. A lack of law business excites sympathy, but it never justifies dishonorable conduct.

The report and recommendation of the commissioners are approved, and respondent's name is ordered stricken from the roll of attorneys of this court.

*Respondent disbarred.*