(No. 27402.—
*In re* HENRY MITGANG, Attorney, Respondent.

*Opinion filed January 18, 1944.*

CHARLES LEVITON, of Chicago, *amicus curiae*.

WARREN H. ORR, (ARTHUR ABRAHAM, and LOREN E. LEWIS, of counsel,) all of Chicago, for respondent.

Mr. JUSTICE GUNN delivered the opinion of the court:

A complaint was brought against respondent, Henry Mitgang, by the Chicago Bar Association to investigate certain practices alleged to be unprofessional and contrary to law, for the purpose of disbarring him.

It charged that in 1931 he entered into an agreement with two laymen, by which they agreed to solicit personal injury and death claims for him, and that he agreed to pay them as compensation a portion of the attorney fees which he might be paid in such cases; and that for a number of years such persons solicited and procured claims, as the result of which respondent was retained to prosecute them,

for which he received large fees, which he divided on the percentage basis; that one of these individuals ceased soliciting claims in 1936, but the other is still soliciting claims for the respondent for personal injuries and death. The complaint also alleges respondent solicited personal injury claims by placing an advertisement in two newspapers in the summer or fall of 1937.

The answer of respondent denies all of the allegations of the complaint, except as to the advertising, concerning which he denies he improperly solicited personal injury or death claims; and further says that the advertisements were only in the newspapers for a little over a week, and when he ascertained they were not regarded as ethical by the bar he withdrew them permanently.

The complaint was prepared in May, 1940, and was not served upon the respondent until February, 1941, and the reports were filed in this court June 16, 1943. Three reports accompany the finding of facts. The first report of the grievance committee of the second division found him guilty of part of the charges and recommended his suspension for three years. Upon objections the report was reconsidered, and recommendation made he be suspended for a period of one year. A special report was made by the board of managers of the Chicago Bar Association sitting as commissioners of this court, recommending that the respondent be disbarred. A rule was entered upon respondent to show cause why he should not be disbarred. Exceptions were filed to all of these reports; briefs were filed by the respective parties and argued orally.

The evidence is voluminous, and that of petitioner consists mainly of the testimony of Marinus Peterson, which it is necessary to examine in detail because all of his transactions are condemned by the *amicus curiae*. Peterson had been a house painter, but because of conditions was unable to continue in that business, and later went into the collection business. In 1931 he became associated with

a man by the name of Collins, and together they carried on the collection business until they started investigation of cases. Prior to their association respondent had been taking care of the legal business connected with the collections handled by Collins. In 1931 Collins and Peterson went to the office of respondent. In their business they had come in contact with people who had had accidents, and as a result of their contact with respondent they became connected with many personal injury cases handled by respondent.

The evidence shows they were associated for something over five years, when Peterson severed his relationship with respondent. A settlement was had between Peterson and respondent under which the former was paid $1000 in cash and $300 later on. On the hearing Peterson testified that he had recommended something over fifty cases to respondent in a period of five years. He testified from memoranda which had been prepared by a young lady who lived in his family, and was interrogated with reference to some eighty cases appearing therein. There is nothing in the record to show what the memoranda contained, other than that counsel for both parties referred to a name on a given page. No details appear as to the amount of work or the sum that was paid on each case.

For the purpose of analysis, the cases described by Peterson from this memoranda may be roughly divided into classes. According to his testimony there are thirty cases concerning which he had no recollection, or that he remembered were not handled by respondent. There are twelve cases which came through the recommendation of a Dr. Stroud, late deceased. There are eleven cases which came through the recommendation of certain members of the staff of the Little Company of Mary Hospital. There are thirteen cases which went directly to respondent, either through his acquaintance with the claimant, or through some other friend of respondent. There are three cases

which originated with the local leader of the Boy Scouts; and there are thirteen cases which originated directly through Peterson's acquaintance, or through friends of Peterson to whom the claimants were referred. Of the six additional witnesses produced for petitioner two come under the group as originating with Dr. Stroud, two of them as being recommended by the hospital, one of them recommended by Peterson himself, and there is no evidence to show the origin of the remaining one. It is thus apparent substantially all of the evidence against respondent is based upon the testimony of Peterson, except the card published in the newspapers.

Without going into the details of each individual case mentioned in the memoranda it is sufficient to take a typical case in each of the groups pointed out above and measure them by the rules established by the courts. Concerning the twelve cases originating with Dr. Stroud, Peterson testified: "I recall [that] case. He was injured in 1933. Dr. Stroud, he's dead, called me up and asked me to come to the office. I got quite a few cases that Dr. Stroud turned over to me. I turned them over to Mr. Mitgang. I don't know who got the contract signed, if there was a contract. When I approached a man like that, blind as you might call it, I explained to him that I represented Mr. Mitgang; that I did investigation on his particular cases and in my judgment that they could receive fair treatment, as good a treatment from Mr. Mitgang as from any other attorney; I had full confidence in Mr. Mitgang and would they be willing to accept him as their attorney. Well, if they said 'yes' I said 'would you be willing to sign a contract.' I had the contracts there." On cross-examination he says: "From my personal knowledge I state that the case * * * which I testified was referred by Dr. Stroud, that [I was] asked that Mr. Mitgang be employed." He so testified with respect to all of the twelve cases, and, as to the group, said: "It is true that in the first instance

the cases were referred to Mr. Mitgang by Dr. Stroud. * * * I was called in, either by Dr. Stroud or by Mr. Mitgang simply for the purpose of investigating the cases. It is true that in each of these 12 cases I did not contact the injured persons for the purpose of procuring cases for anyone, but that either Dr. Stroud or the injured persons got in touch with me themselves, in the first instance. It is true that I did not solicit any of these 12 cases."

The respondent testified with respect to the Dr. Stroud cases: "I had known Dr. Stroud for quite a few years. I did not meet him through Peterson. * * * He had a very general practice and a good many industrial cases." The procedure in each case was: "Dr. Stroud would call me on the telephone and tell me that he had a patient that had been injured in an accident, tell me something about it and ask me if I wanted to handle the case for the people. * * * I would either tell Dr. Stroud to call Mr. Peterson and ask him to go out and get the information, or I would call Mr. Peterson myself and tell him to go over and see the people. None of the cases that were referred to me by Dr. Stroud originated with Marinus Peterson."

Two of the other witnesses were persons among the twelve listed to whom respondent was recommended by Dr. Stroud. Nellie Elizabeth Perry testified she was injured in 1933 and had Dr. Stroud. "He recommended a good attorney and we had him for our physician for so many years that I had confidence in him, and said it would be all right. He recommended Mr. Mitgang. After the doctor mentioned Mr. Mitgang's name I think this Mr. Marinus Peterson came to our house. * * * I went to Mr. Mitgang's office. * * * Dr. Stroud spoke so well of Mr. Mitgang. * * * I imagine Mr. Peterson said something about going to Mr. Mitgang's office, or something. I am not sure." The other witness called testified Dr. Stroud had been their physician for some time, and when his wife was injured in 1932 or 1933 she re-

tained an attorney, and that he sent Mr. Peterson over to his home, who, he understood was representing Mr. Mitgang, and that he met him later and signed a contract on a one-third basis. The foregoing is the substance of the testimony in the cases in which Dr. Stroud's name is mentioned.

In the group of cases originating in the hospital Peterson testified his wife was a patient in the hospital for three months as the result of an accident; that he became acquainted with the Sisters and Mother Superior, and they told him they had quite a lot of trouble with accident cases. "I made this suggestion, that if I tried to recover for them in cases where there was no insurance and such things as that, would she be willing in return if the people were satisfied, to have me sign a contract with them" to which she agreed. "I investigated a number of cases for the Little Company of Mary Hospital, lots of them * * * were hit by cars or other ways hurt,—there was no recovery made. * * * I went to see them and explained to the people that the * * * Hospital would be glad to go along with them if there was some way to pay, if not the whole cost, at least part of the cost. * * * I tried to find out just what their financial condition was and then in turn I reported to the Sisters, and as a result of that they recovered hundreds of dollars they otherwise would not have gotten. They appreciated it. The Mother Superior was in full accord with me at that time. I always conducted myself in a gentlemanly manner. I never forced my attentions on anybody. There was a number of cases where the party had friends, you know, that were attorneys, or they had attorneys in the family, and of course, I did not bother them. * * * Before I would sign up a case in the * * * Hospital I made this rule: 'You must call one of the Sisters, because you don't know me. * * * I want you to call them, and have them tell you whether they believe I am all right, whether you can be-

lieve me or not.' \* \* \* That is how I got these cases. \* \* \* I turned them over to Mr. Mitgang with the full approval of the hospital." On cross-examination he says that in each of the twelve cases he sent to respondent he was referred to the injured person by some Sister of the hospital, and that he never did go about the hospital soliciting cases, either for Mr. Mitgang or anybody else, and that he did not solicit any of the cases mentioned in the memo, and that in each instance he was first contacted by some Sister from the hospital, who knew or had become acquainted with the injured person; that he never was in the hospital unless he was called there.

Respondent testified Peterson told him that he was collecting bills for the hospital, and there were some people about whom the hospital was concerned as to payment, and wanted to know if the hospital referred any cases to him for investigation, "and if the people wanted me as the attorney if I would handle them, and I told him yes. \* \* \* I never split fees with Marinus Peterson. \* \* \* It did not at any time come to my knowledge or attention that Marinus Peterson was soliciting, or had solicited any cases for me."

One of the witnesses in the hospital list testified he was in an automobile accident and was taken to the hospital, and after he had been there about a half hour one of the Sisters wanted to know who was going to take care of the bills; and that she brought over a man by the name of Peterson, and said "here is a man who takes care of a lot of our cases for us, and he investigates all accidents, and he can help you a lot." He replied that was the kind of a man he wanted, and that Peterson described how he investigated cases, and that he did not at that time discuss anything about an attorney; and that afterwards he signed a paper for him, and the next day he came around and said he had gotten statements from the witnesses; "and if I wanted he was going to take me

to the attorney to make arrangements for me." That was the time he mentioned Mitgang and that both Peterson and Mitgang were present and asked him how the accident happened, and after that he saw Mitgang time and time and again.

The three cases coming through the Scout Master are substantially of the same pattern as those coming from the hospital. As to the thirteen cases which came directly to respondent, or through his personal friends, it seems unnecessary to comment other than to give an illustration of one which was referred by a friend. Respondent had represented a man successfully when the latter's brother-in-law was seriously injured. The wife called up Peterson after the injured man had been home from the hospital about a month. He knew Mitgang and insisted upon having him employed, and Peterson had nothing to do with it. There was a substantial recovery in this case, and the trouble between respondent and Peterson grew out of the refusal of the attorney to give him half of his fee in that case.

The remaining cases mentioned in the memoranda were ones in which Peterson either personally knew the injured person, or was called by a personal friend of his who was acquainted with the injured party, and a fair sample of the procedure in such cases is illustrated by the following: In the case of Anderson he says that he was a personal friend of McBride; that he met Anderson at McBride's; he came there by appointment. "I don't know whether or not Mr. Anderson knew Mr. Mitgang previous to that time. I went home and talked to the father first and explained what it was all about, and as a result of that the father told me to go ahead and retain Mr. Mitgang." On cross-examination Peterson said that either McBride or Anderson requested him to recommend an attorney, and that he did not make any recommendation until requested by one of them. Anderson, when called as a witness, said

Peterson called at his home to interview a brother concerning an accident, not connected with his, and that "was how I became acquainted with him;" that he did not know McBride personally, but only knew him as connected with his brother's case; that at his suggestion he retained Mitgang, who sent him to Dr. Stroud, but he did not know whether Stroud was paid anything or not; and that he received a settlement at the conclusion of the case.

Another case in which Peterson was the sole connection is that of Mrs. Langdon. Peterson testified he was acquainted with her through working with her daughter's husband; that he went out to see the husband, who recommended that the case be left in his (Peterson's) hands, and Mitgang was retained. On cross-examination he testified her relatives asked him to see Mrs. Langdon; took him out there and requested that he recommend an attorney, which he did.

With respect to every case mentioned in the memoranda Peterson testified positively there was no solicitation upon his part, and that he never made a recommendation unless asked by the injured persons. The foregoing constitutes a general resumé of the type and origin of the cases mentioned by the witness Peterson, although the details differ somewhat as to each individual mentioned in the several classes.

On the question of compensation and employment the testimony is substantially as follows: When arrangements were made for service in 1931 Peterson asked Mitgang if he was going along and do as other attorneys were doing; whether he was going to "split the fee with me or not," but that Mitgang replied "well, I can't split no fees with you Mr. Peterson, but I will see that you are well paid for your work, * * * but I will see that you are paid and paid good because there are cases where I will be able to pay you better than other cases." He says that later there were some hard feelings because he found out that

other fellows turned cases over to attorneys and were getting half of the fees, and he refused to "pay me that, and I thought that was not right. As long as others were doing it I thought he could do it, and he refused." As to the amount of compensation, he testified he thought he was paid something like thirty per cent of the fees which were recovered. On cross-examination he said there was no specific agreement to split fees, and that he had heard other people were doing it and he thought he was slighted; that it was true he investigated a lot of cases referred to him in the first instance by Mitgang, where he did not have anything to do with the employment at all; that there was no distinction in the settlement for work on cases he investigated for Mr. Mitgang, where he had nothing to do with the employment, and those cases where he recommended Mitgang; that he was paid for the time spent, and that he did not have any agreement he was going to be paid anything for procuring a lawyer; that the only thing he was to be paid for, as a matter of fact, was for investigating,—the work that he actually did; that there was no settled percentage he was to get, but it might average thirty per cent; that he never had made a computation of the amounts he received to determine whether it was thirty per cent, or any other percentage; that one time he tried to keep a record of the time on the average of $1.35 to $1.50 per hour, so as to have the amount he received bear some relation to the amount of time he put in; that when he said he received a part of the fee he meant he was paid only after Mitgang had received his fee. At the time he had the settlement he was making a claim for investigating work in all cases, regardless of whether he had anything to do with the employment or not.

The respondent, on his part, testified positively that Peterson inquired if he could do investigating work for him, and that he agreed if he did a good job he would pay him what he could make as a painter, which was $1.35 per hour,

and he could pay him when he got the money out of a case; that as to the amount of time spent he had largely to rely upon Peterson's statement, and what the files in the case showed; that on the occasion of the disagreement there had been a case in which there was a substantial recovery, in which they figured what he had coming for investigation on that and some other cases, when Peterson inquired about getting half of the fee, and that he responded "where do you get the idea you ought to get half of the fee," and told him he never had had an understanding to split fees and could not do it, and Peterson replied if he would not split fees he could go to somebody else who would; and that shortly after that Peterson quit, and the computation was made as to the total amount due for the work, which was fixed at $1300, of which $1000 was paid in cash.

The other partner, Collins, continued to work as an investigator for two or three years more, but does not appear as a witness in the case. This settlement took place between the parties in 1936, and the complaint was made in 1940 and served in 1941. Both the respondent and the witness Peterson testified that most of their records in the several cases were lost or destroyed before any investigation was started, and that all that was left in the way of records was the memoranda from which Peterson testified. It appears Peterson investigated many cases for respondent which did not originate with him, and respondent upon his part testified that the number of such cases which were investigated was two or three times as great as those which originated directly or indirectly through Peterson.

The character of investigation performed by Peterson shows he ascertained who were witnesses; inspected the police blotter; talked with all witnesses; traveled to many places and sometimes outside of Chicago; kept in touch with the case pending trial; prepared the statements of witnesses to be used on the trial; would visit them from

time to time, and subpoenaed them and used his own automobile and furnished his own gas.

There are many other details, and we have thus recounted the salient features of the evidence because there is a complete disagreement between counsel for both parties as to the legitimate inferences to be drawn from it and to the law applicable. Strong reliance is placed upon the canons of ethics of the State and American Bar Associations. We have held such canons are not of binding obligation and are not enforced by the courts as such, although they constitute a safe guide to professional conduct to which they apply, and we may discipline an attorney for not observing them. *People ex rel. Chicago Bar Ass'n v. McCallum,* 341 Ill. 578; *People ex rel. Chicago Bar Ass'n v. Berezniak,* 292 Ill. 305; *Hunter v. Troup,* 315 Ill. 293.

Hearings in disbarment proceedings are judicial, and must be governed by the same rules as to competency and weight of evidence as are applied to other cases on questions of fact. (*In re Needham,* 364 Ill. 65; *People ex rel. Chicago Bar Ass'n v. Amos,* 246 Ill. 299.) In order to warrant disbarment or suspension the record must be free from doubt not only as to the act charged but also as to the motive with which it is done. (*In re Brumund,* 381 Ill. 139; *In re Greenberg,* 380 Ill. 417; *In re Hallmann,* 384 Ill. 325.) A lawyer will not be subjected to discipline merely upon suspicious circumstances. (*In re Amaden,* 380 Ill. 545.) Where, however, the evidence is clear and conduct is shown which displays moral turpitude, immorality and lack of honesty or professional conduct contrary to the public good or welfare, we do not hesitate to either suspend or disbar the violator. *In re Goodman,* 377 Ill. 178.

The first ground of complaint is the insertion in the *Chicago Evening American* of September, 1937, of a professional card reading as follows: "Henry Mitgang, Attorney at law, Specializing in Personal Injury Claims,

· 10 N. Clark St., Phone Franklin 2341," and a like card in the *Southtown Economist* in July, 1937. The evidence shows these cards were inserted for a very short period of time, a week or two at the most. The respondent testified he thought it was not objectionable to the rule of this court, but when informed by other members of the bar that it was not considered ethical he stopped it and never had it published afterwards.

In *People* v. *Berezniak*, 292 Ill. 305, we said we did not consider all forms of advertising unethical or unprofessional, and that Canon 27 of the American Bar Association does not entirely forbid advertising, but recognizes the publication and circulation of ordinary business cards, and that cards should be limited to a simple statement of the attorney's name, location, and a statement of his specialty, if he has one which is not prohibited by law. The respondent in the *Berezniak case* was reprimanded because the publication contained testimonials and recommendations containing extravagant praise of his ability and success, and under the holding in that case, as well as the fact the card in the instant case was withdrawn when it did not meet with the approval of other lawyers, we consider this charge is not sustained. The *amicus curiae* does not so claim in his brief, but says it should be considered with other evidence as tending to prove the other charges. We do not follow the suggestion that a fact innocent in itself is corroborative proof of other charges, when it is unrelated to any specific case mentioned in the evidence.

The general charge that respondent divided legal fees received by him from cases coming into the office directly or indirectly through the witness Peterson is not sustained. In two places on direct examination Peterson says there never was any agreement to split fees, and on cross examination relates the trouble arising between himself and respondent grew out of his refusal to split fees, but *amicus curiae* relies upon the general statement that he thought

he received about thirty per cent. On cross-examination, however, this is shown to be a mere estimate, and no pretense is made by the witness that this was a sum paid to him in each case. As a matter of fact the respondent tes-, tified Peterson was to be paid $1.35 per hour acting as an investigator, and that he investigated many cases besides those in which he was interested. It appears many of the cases resulted in recoveries of very small amounts, or no amounts whatever, but that Peterson was paid without regard to whether there was a recovery.

It is contended, however, that no weight should be given to the cross-examination of Peterson because many of the facts were elicited by cross-examination. It has always been the law that cross-examination is for the purpose of finding the true facts concerning which the witness testifies, and generally leading questions are permissible. It would be something new in the practice if on direct examination one party was entitled to prove merely part of the facts, and then give no weight to explanatory details brought out on cross-examination. The administration of justice requires that the weight and effect of the testimony of a witness be determined by considering all he has said, and not merely that supporting one side.

It is suggested such a course would be proper in the present case because Peterson was an unwilling witness, but respondent's counsel on the other hand claimed he was a hostile witness. We have examined the questions and answers in the report of his testimony and find nothing to support either contention. He answered freely and frankly all interrogatories of each of the counsel who questioned him. Something more than the mere statement of counsel, without evidence in the record to support it, is necessary to justify the conclusion the witness is either unwilling or hostile. The witness frankly admitted he felt slighted and hurt, and quit his employment because respondent would not split fees, but said he was inclined to be pretty hot-

tempered, and may have said things that possibly caused the trouble. We are inclined to believe from an examination of the evidence his memory may have been at fault in some respects, because he had no recollection of something over one third of the cases contained in his memoranda, but this does not appear to have resulted from either animus or reluctance.

There is nothing in the testimony of any of the other witnesses that bears upon the question of splitting of fees, and this charge in the complaint in our opinion has not been established.

The balance of the charges in the complaint relate to soliciting business in an improper, unethical and unprofessional manner. The witness Peterson has been characterized as a runner, ambulance chaser, huckster for business, intermediary and go-between. As a matter of fact and law this is what the *amicus curiae* is attempting to show Peterson to be. It is the critical point for determination. It is the result that must first be reached before a case is established against respondent, and that must be judged by the testimony alone, and not by the statement of counsel, which is but the conclusion of what the evidence is claimed to establish.

Both respondent and Peterson testified he was employed as an investigator. It has been many times held that a lawyer is entitled to employ an investigator. In *In re Salus*, 321 Penn. 103, 184 Atl. 69, it was said the employment of a trained investigator by an attorney to discover facts concerning a case in which he is retained is the legitimate right of every practicing attorney. In *In re McCullough*, 97 Utah, 533, 95 Pac. (2d) 130, the court said: "The employment by an attorney of an investigator in personal injury cases is of course not unethical, and it cannot be inferred from such employment alone that the attorney is engaged in 'ambulance chasing'." The same, in effect, was said in *In re Sizer*, 306 Mo. 356, 267 S. W. 922.

328

The question for determination in this case is whether it is established by the evidence that Peterson was a runner or hired agent of respondent, hired for the purpose of procuring cases, and receiving his pay from the amount collected. We have been referred to no decision of this court directly involving this charge, where a respondent has been suspended or disbarred. In the *Berezniak case* the charge involved unethical advertising. It is true by way of comment that ambulance chasing as defined above is severely condemned, and said to be ground for disbarment. In the case of *People* v. *McCallum,* 341 Ill. 578, while it was recognized that solicitation of business was contrary to the ethics of the State and American Bar Associations, yet it was also said that the offense of solicitation charged against the respondent was not one which imported, nor did the evidence produced show, criminality, fraudulent practices, or moral turpitude, but was condemned as an improper practice and, if persisted in, would justify disbarment.

The cases referred to respondent by Dr. Stroud do not come within any of the condemned practices. In *Chreste* v. *Commonwealth,* 171 Ky. 77, 186 S. W. 919, it is stated: "The friends, acquaintances and associates of the attorney have, of course, the unquestioned right to sound his praises and to divert to him such clients as they can persuade in a legitimate way to engage his services." The testimony of Peterson shows beyond question each and every one of the cases contained in his memoranda as coming from Dr. Stroud came to respondent through the doctor, and not through Peterson. It is true that in many cases Stroud called up Peterson, but that was for the purpose of having the cases investigated, as the respondent testified, and it seems reasonable to say that he would not expend money in investigating cases unless he had a contract to handle the case.

As to the thirteen cases listed on the memoranda as coming to respondent directly, or through some other personal friend of respondent, and referred to the witness Peterson merely for investigation, respondent cannot be censured. We are not so unfamiliar with legal business as to suppose that it drops casually into the office of lawyers in such a way that they share business in proportion to their number, but each attorney depends upon friends, associates and those who have engaged his legal services, and from any other number of circumstances showing his ability to handle law business. If obtaining business through friends were to be condemned it would extend over a large and complicated field, and might cause doubt as to the legitimacy of business coming through representing a client who through extensive business interests would have an opportunity to make many recommendations. For time out of mind the volume of the lawyer's business depends not only upon his own ability, but upon recommendations of friends and acquaintances.

The cases coming through the Little Company of Mary Hospital are somewhat different. There was a good reason for Peterson to be on a friendly basis with the hospital staff, because his wife had been a patient there for three months, and he had also been making ordinary collections for them. He was aware of the inability of the hospital to collect their bills in many accident cases, and the hospital was glad to know of a way of making collection. He, however, says he never solicited a case, or talked with the injured person unless called by the Mother Superior or some other nurse. There is no pretense that respondent personally solicited these cases, nor any proof that he knew of the arrangement with the hospital. In a somewhat similar case, where the attorney for a hospital was called by a member of the hospital staff to investigate and bring a suit for injured patients, and did in fact bring

a suit, we held the offense of improper solicitation was not established. We disapproved of the practice, but said it was entirely insufficient to warrant suspension or disbarment. (*In re Dunn*, 370 Ill. 413.) To the same effect is *Hildebrand* v. *State*, 18 Cal. (2d) 816, 170 Pac. (2d) 860, a case in which respondent was held not guilty of soliciting when called to the hospital by a doctor in·charge and told there were patients who desired to see him professionally, in the absence of a showing that there was an arrangement under which the doctor was to obtain clients for the attorney.

Respondent testified Peterson told him the hospital was concerned about whether it was going to be paid, and inquired if respondent would handle the cases referred to him by the hospital, provided they wanted respondent for an attorney. This is in substantial accord with Peterson's testimony. Even though Peterson did make the suggestion to the hospital of a way in which it could collect its bills, still if the hospital was the moving party in each separate case it comes within the rule we have announced. We do not, however, approve of the practice, as the difference between innocent recommendation and clever solicitation is sometimes indistinguishable. Since Peterson's testimony is substantially corroborated by the cases originating in the hospital we are unable to say there is sufficient proof to establish the charge as to this group.

The remaining instances where cases were referred to respondent by Peterson through his own acquaintance with the injured party, or where he was introduced by a mutual friend, present more clearly the real issue involved. The question is: May an employee of a lawyer who earns his pay by the investigation of negligence cases, refer a friend or acquaintance to his employer when both the lawyer and the employee know the recovery of damages will be the source of the employee's compensation? Our research dis-

closes courts are extremely reluctant to give a definition of solicitation which is accurate for every case that may arise. They have frequently decided what is not improper solicitation, and we think a majority of the courts have been more severe in cases involving the employment of what are commonly designated as ambulance chasers or runners. These terms are generally meant to include those who seek out persons and direct them to an attorney in consideration of a percentage of the recovery.

Conceding this is the usual type of case appearing in the decisions the condemnation may be applied where the arrangement is seemingly innocent, but the evil effect is nevertheless the same. Soliciting law business is a broad term and reaches from propriety to indecency. No one can deny that a lawyer who extends his acquaintance in the proper manner indirectly solicits business by the friendly relations or good impression made upon those whom he contacts. So, also, professional relations with a client who has many contacts with individuals who are apt to have law business, has a like result. Certain types of business are properly solicited by subscriptions to commercial or forwarding agencies, in which a fixed division of fees is approved. It is generally known that insurance companies employ lawyers whose main business is to investigate accident cases, who are frequently employed to defend suits arising out of them. It is true the insurance company is the employer, but the case comes to the lawyer because of his first employment.

We have held it is not improper to solicit claims for the purpose of filing a petition in bankruptcy, where it will aid a client in the collection of his debt. (*People ex rel. Chicago Bar Ass'n* v. *Edelson,* 313 Ill. 601.) Other legitimate means of acquiring business through other persons, or causes, may be readily illustrated. We are, therefore, not disposed to lay down a fixed rule of what constitutes

solicitation of business as applied to disbarment proceedings. We think the distinction running through all of the cases is pointed out in *Chreste* v. *Commonwealth,* 171 Ky. 77, 186 S. W. 919, where agents or runners are deemed as persons stirring up strife or litigation for a stipulated consideration or a contingent fee. Such persons are not restrained by any sense of propriety, and their sole object is to secure clients for their employers, and they use such arts and schemes as will get results.

In the case of *People* v. *Edelson,* 313 Ill. 601, we said: "The motive of the solicitation was important in determining the propriety of the action. If it was to begin litigation in order to enable the respondents to secure fees for themselves the action was unprofessional and dishonorable; if it was to secure their clients' claims it was not unprofessional or dishonorable." It is clear that courts without giving a specific definition of solicitation hold it is unprofessional not only to employ a runner, but to enter into any contract or arrangement under which an inducement is offered tending to encourage the practice of bringing cases to a lawyer, especially by making the compensation depend upon recovery of damages.

In many, if not most, of the instances recited by the witness Peterson it appears respondent believed in good faith he had a client and was protecting the client's right by investigation. However, the evidence shows Peterson was allowed to carry contracts of employment signed by the respondent, which Peterson procured to be signed by the injured party before he had conferred with respondent. It was explained that this was because he did not want to incur the expense of paying an investigator without being certain of the client. Inevitably the pay to be received for investigating would have more of an effect than mere friendship in the activities of such an employee. It may be that Peterson exercised his discretion properly, but human nature being such as it is, approval of such a

general practice might be the means of condoning an evil currently reported to be widespread.

In *People ex rel. Chicago Bar Ass'n* v. *Baker,* 311 Ill. 66, we said: "Unprofessional conduct which would justify disbarment must have an element of immorality or dishonesty, or be of such character as to be in violation of private interests or the public good." Respondent was a lawyer; he knew the restrictions on professional conduct; he observed it by refusing to split fees; he withdrew professional cards from publication not approved by the canons of ethics, but he permitted an investigator to accept in his name contracts of employment which would result in fees to the investigator, which would eventually be paid from the recovery of money in personal-injury actions. The fact both respondent and Peterson deny there was any actual solicitation does not cure the evil, because the opportunity was present. Assuming both to be honest, the arrangement was contrary to the public good.

The division line seems to be clear. A lawyer must not only observe professional requirements in obtaining business, but also must refrain from giving to employees, not lawyers, an inducement to seek out cases or to stir up litigation. There is no evidence to show fraud or overreaching of clients, but respondent was bound to know the spirit of a forbidden contract was violated when the evil possibilities of the arrangement are disclosed.

We have reached this conclusion from the evidence, and not by reason of the contention on the part of the board of managers that the proof of suspicious or incriminating circumstances shifts the burden of proof in disbarment cases to the respondent. This position finds no support in our decisions, as we have frequently held we should proceed cautiously in depriving a lawyer of his professional life, and the charges must be supported by convincing proof. Respondent has offered evidence of his good reputation for truth and professional standing

among his associates and the judges before whom he practiced, which has weight where motive is an element of the offense charged.

We have examined at length the evidence presented by the *amicus curiae*. This has been necessary not only to separate the instances where the proof fails to show unethical practices, but also to make clear the offense we are condemning. Keeping in mind that Peterson was admittedly employed as an investigator and did investigate the cases involved, as well as many others, and considering no fraud or overreaching has been claimed or proved, we consider that the principal transgression of professional propriety established does not justify the permanent disbarment or suspension of respondent. However, the evil effects that might result by an implied approval of a contract made between an attorney and an investigator, which permits the latter to carry signed contracts and have them executed by the injured party, and where the compensation of the investigator may depend upon the collection of fees from recoveries, cannot be overlooked by the court.

This case has been pending three years, and the complaint made four years before that time. The only offense shown is one that has not heretofore been passed upon by this court, and may not have been deliberate on the part of respondent. However, the practice has so many evil possibilities that, regardless of the honesty of purpose or motive, it must hereafter be regarded as unethical or unprofessional conduct, which, if persisted in, will justify suspension or disbarment.

While we do not believe, under all the circumstances proved, respondent should be suspended or disbarred, his acts above specified are by no means approved, but, on the contrary, because of them he is deserving of censure.

*Respondent censured.*