Rupert C. Watkins, Appellee, v. Civil Service Commission of City of Chicago, Stephen E. Hurley, President, and Albert W. Williams, Member of Civil Service Commission of City of Chicago, Appellants.

Gen. No. 46,504.

First District, Second Division.

September 20, 1955.

Rehearing denied October 25, 1955.

Released for publication October 25, 1955.

John J. Mortimer, Corporation Counsel of City of Chicago, for appellants; L. Louis Karton, Head of Appeals and Review Division, and Arthur Magid, Assistant Corporation Counsel, both of Chicago, of counsel.

Michael F. Ryan, of Chicago, for appellee; Richard F. McPartlin, Jr., of Chicago, of counsel.

PER CURIAM.

Suit was filed in the Circuit Court of Cook County under the Administrative Review Act to review an order of the Civil Service Commission finding the plaintiff, a patrolman of the Chicago police department, guilty of conduct unbecoming a police officer and ordering him discharged. The trial court entered a final judgment setting aside the finding and decision of the Civil Service Commission. From such judgment this appeal is taken.

The defendants' theory is that the evidence before the Commission clearly established that the plaintiff was guilty of the charges filed against him before the Civil Service Commission that he failed and neglected to perform his duty as a police officer in that he permitted a prisoner to escape. The plaintiff's theory is that the finding of the Civil Service Commission is against the manifest weight of the evidence and that the discharge of the plaintiff was without cause.

There is very little controversy as to the facts. It appears from the record that the plaintiff, a patrolman in the police department of the City of Chicago, at about 11:50 p. m. on October 9, 1953 was ordered by his superior officer to guard a prisoner, one Jones, at the County Hospital from midnight until 8:00 a. m. October 10th. Jones had been shot during a holdup attempt and was in a bed in a ward at the County Hospital. The plaintiff knew at the time that Jones had previously escaped under similar circumstances and had been recaptured. Another prisoner, one Carroll, also wounded, was in the same ward as Jones. Jones and Carroll were in beds in a ward about 160 feet long, 60 feet wide, containing 39 to 45 beds arranged across from each other along opposite walls. At the end of the ward farthest from the corridor entrance there was a door leading to a fire escape. The entrance door from the corridor is six feet wide, and the corridor itself is 10 or 12 feet wide. Jones was in the fourth bed along the east wall, near the door to the fire escape. The bed occupied by Carroll, the other prisoner, was about 60 feet away from the bed occupied by Jones, and a person located at one of the beds could not see the other. A screen had been placed about the bed of one of the other patients and was so placed that it covered the fire escape door, and, according to the testimony it also obscured the view of the prisoner Jones' bed from the corridor. The ward in which the prisoners were confined was a cancer ward and some of the patients were

in the terminal stages of the disease. All the shades in the ward were pulled down either completely or partially, the lights were all out except the fire light, and the visibility was bad. In order to inspect the prisoners a flashlight was used. Carroll was handcuffed to his bed, while Jones' arms and legs were encased in leather shackles.

Plaintiff had been appointed to the police department on March 22, 1953. At the time of the occurrence he was specifically assigned to guard Jones. Police officers Johnson and Anderson, who were under Captain Kells of the Chicago police department, had been assigned to guard Carroll. Captain Kells testified that on October 8th he had assigned Officer Johnson to guard Jones as well. Sergeant Lescher testified that Johnson had previously been assigned to guard Carroll and that on October 8th Captain Kells, by special order, ordered Johnson to guard Jones as well and that he (Lescher) read this order to both Johnson and Anderson; that he assigned Anderson also to guard Jones and at the time told Johnson: "Now you have a different prisoner to watch. You have to watch Jones, but there are two of you there now and you are both responsible in case one of you have to go for water or something like that, there are two of you there . . . if one of you have to go to the washroom, still one would be present." The sergeant also testified that he did not know about the third man being there, referring to the plaintiff, Officer Watkins.

There is no evidence in the record that any instructions were given Officer Watkins with reference to the method of guarding Jones. This was the first time that he had the duty of guarding a prisoner. The odor from the patients in the ward was bad, and on that account the three officers, on their own initiative and without any consultation with or orders from their superior officers, agreed that they would take turns staying in the ward. While one officer was in the ward the other

143

two officers would be in the corridor. The man in the ward would stand guard for five to ten minutes before being relieved, and he would watch both prisoners. Captain Patrick J. Groark testified that it was "absolutely proper procedure" for both officers to station themselves at the bed where they could observe the prisoner.

From the testimony it is apparent that from the position occupied by the two officers who were in the corridor they were unable to see the prisoner Jones. The plaintiff checked both prisoners at 2:45 a. m. and stayed in the ward about seven minutes, and then Officer Johnson took over at about 2:55 or 3:00. Anderson then went into the ward about 3:03 or 3:04, and Johnson joined Watkins in the corridor. At about 3:25 a. m. Johnson went into the ward and found that Jones had escaped. Anderson at the time had gone back to the other end of the ward.

Following the escape the three officers were suspended. The plaintiff in his report to his commanding officer, Captain Groark, did not inform him about the plan the officers had worked out by which they alternated in guarding Jones. None of the officers were told by a superior officer that they could leave the prisoner out of sight. Prior to this time the plaintiff had no complaint against him, had been a good police officer, and had done satisfactory work. Captain Patrick J. Groark, the superior officer of the plaintiff, initiated the charges, which were brought before the Civil Service Commission by Commissioner of Police O'Connor, to the effect that the plaintiff was guilty of conduct unbecoming a police officer or any member of the police department, in that he was guilty of neglect of duty since he failed and neglected to guard the prisoner Jones in such a manner as to prevent his escape from the plaintiff's custody. A full hearing was had before the Civil Service Commission.

The finding of facts in part was that the plaintiff and Officer Johnson were assigned to guard Jones, a prisoner who had previously escaped from arrest; that they were "ordered by their superior officers to guard such prisoner at all times while so assigned"; that a third officer, Anderson, was assigned to guard Jones and another prisoner in the same ward of the hospital; that "Jones was checked in such bed from time to time by the respondent and Johnson after midnight . . . and between such checks the respondent and Johnson usually remained in a corridor or ante-room outside the said ward from which neither the respondent nor Johnson had a clear view of the prisoner, Jones"; that visibility in the ward was low; that the last check made by the plaintiff of the prisoner was about 2:45 a. m.; that shortly after 3:00 Johnson found the prisoner had escaped; that at the time of such escape by Jones both the respondent and Johnson were in such a position that Jones was out of their sight. In its finding of facts the Commission further found that by reason of the acts and conduct set forth therein "the respondent was on October 10, 1953, guilty of conduct unbecoming a police officer and a member or employee of the said Department of Police and of neglect of duty in that upon said last mentioned date the respondent allowed a prisoner who was under arrest to escape from his custody, in that upon such date the respondent was especially assigned to guard one Fred Jones who was in the custody of the police, and in that on such date the respondent failed and neglected to guard the said prisoner, Fred Jones, in a manner so as to prevent the escape of the said Fred Jones from the respondent's custody"; and that by reason of the findings of fact and of guilt herein that cause exists for the discharge and removal of the respondent from his position as a patrolman. In accordance with its findings, the Commission ordered plaintiff's discharge and removal from the police department.

145

■ ■ In the opinion in Nolting v. Civil Service Commission et al. (7 Ill.App.2d 147), filed this day, we have fully discussed the permissible scope of the court's review of the findings and order of the Civil Service Commission, and the principles set forth in that opinion are controlling here. As stated in that opinion, we are here dealing with a matter of discipline in an armed force of more than seven thousand men, and this is a matter which vitally concerns the protection of the citizens of this metropolitan area. The findings of the Civil Service Commission herein were not capricious or arbitrary, nor were they against the manifest weight of the evidence. The findings were definitely related to the requirements of the service, and were not unreasonable. We have no power to determine the extent of the punishment, which is a matter within the discretionary power of the Civil Service Commission. Based upon the findings the decision of the Civil Service Commission is proper. The judgment of the Circuit Court of Cook County is reversed, and the decision and findings of the Civil Service Commission are affirmed.

Judgment reversed.