Dr. Bernhard Samter, Plaintiff-Appellee, v. Department of Public Welfare, and Illinois State Civil Service Commission, Defendants-Appellants.

Gen. No. 10,906.

Second District.

March 20, 1956.

Released for publication April 9, 1956.

Latham Castle, Attorney General, State of Illinois, of Chicago, for defendants-appellants; William C. Wines, Raymond S. Sarnow, and A. Zola Groves, Assistant Attorneys General, of Chicago, of counsel.

Dale Ferguson, and Paul E. Rink, both of Rock Island, for plaintiff-appellee.

JUSTICE EOVALDI delivered the opinion of the court.

This is an appeal from an order of the circuit court of Rock Island County reversing the findings and decision of the Civil Service Commission, which, in turn, had discharged the appellee from his position as Psychiatrist I in the East Moline State Hospital and ordered his reinstatement to his position with the Department. The proceedings were based upon the provisions of the Administrative Review Act, Chapter 110, pars. 264 to 279, incl., Ill. Rev. Stat., 1953.

Defendants-appellants' theory is that the evidence sustains the Department's finding that appellee mistreated a mental patient in violation of applicable rules and that the trial court erred in holding the contrary. It is plaintiff-appellee's theory that the Hearing Officer of the Commission entirely ignored the law in his findings and conclusions; that the manifest weight of the evidence clearly indicated that the plaintiff's actions were justified; and that the Department's Rule No. 25,

on which the Commission's judgment was based, is merely a directive as to the administrative duty of the Superintendent of the Hospital and not a restriction on the plaintiff.

The request for the discharge of plaintiff was based upon the following charges:

"1. Abuse of a mental patient. On September 16, 1953, Dr. Samter attacked patient, Jerry Katapodes, with intent to do bodily harm.

"2. Conduct unbecoming a State employee. By his abuse of the patient Dr. Samter exhibited conduct that cannot be tolerated in the Department of Public Welfare or by his hospital.

"3. Violation of rules of the Department. Dr. Samter's action in the treatment of this patient was a stringent violation of Administrative Regulation No. 25 concerning mistreatment of patients."

Regulation No. 25 of the Rules and Regulations of the Department of Public Welfare of the State of Illinois, reads as follows:

"Mistreatment of patients, wards or members of state institutions under the Department of Public Welfare:

"The superintendent of a state institution shall see that all staff officers and personnel of his institution understand that no mistreatment of patients, wards, or members will be condoned.

"Mistreatment may be defined as: (1) Forcibly laying hands on patients, wards or members; (2) striking, pushing, pulling or shoving patients; (3) corporal punishment of any sort; (4) violence of any character; (5) use of violent, profane or obscene language; (6) use of seclusion in mental hospital; (7) applying restraint at hospitals for the mentally ill without a physician's written prescription; (8) administering restraint or seclusion in the security facilities without a physician's written prescription; (9) any other ac-

tion on the part of any employee towards a patient, ward, or member which would be injurious to such patient, ward or member, including deliberate neglect or failure to respond to his obvious needs."

As will be pointed out later in this opinion, plaintiff had spent almost his entire professional life dealing with patients in mental institutions. To have reached the grade of Psychiatrist I, after having served as Physician I at this institution for many years, he must have familiarized himself with certain of the rules and regulations of the institution.

As to his contention that the above regulations apply only to the Superintendent and are not binding on plaintiff, reference is made to 43 Am. Jur. (Public Officers), Par. 281, wherein it is said:

"It is settled, subject, however, to a number of exceptions, that in the absence of a statute imposing liability, or of negligence on his part in appointing or supervising his assistants, an officer is not liable for the default or misfeasance of subordinates and assistants, whether appointed by him or not, providing the subordinates or assistants, by virtue of the law and of the appointment, become in a sense officers themselves, or servants of the public, as distinguished from servants of the officer, and providing the officer does not direct the act complained of, or personally cooperate in the negligence from which the injury results."

Plaintiff was an appointed assistant as distinguished from a servant of the Superintendent. Nothing in the evidence would tend to indicate that anyone directed the doctor to take the action he took with reference to the patient. In Barker v. Chicago, P. & St. L. Ry. Co., 243 Ill. 482, our Supreme Court held that public officers and agents of government are liable for their own personal negligence or defaults in the discharge of their duties, but are exempt as such

officers or agents, from liability for the negligent acts of their subordinates in performing their duties. Section 16 of the Civil Administrative Code, Ch. 127, Ill. Rev. Stat., 1953, empowers the director of each department to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its employees and clerks, etc. Regulation 25 has been promulgated by the Department, and it can hardly be contended that it applies only to the Superintendent when we consider that without the help of assistants, it would be impossible for the Superintendent to properly carry out the myriad of functions attendant to his office. The rule specifically states that: "The superintendent of a state institution shall see that all staff officers and personnel of his institution understand that no mistreatment of patients, wards, or members will be condoned." The contention that the Superintendent is the only person who can be guilty of violating Rule 25 is without merit.

From the record it appears that the plaintiff had been an employee of the State of Illinois at East Moline State Hospital since February, 1947, as Physician I, and since October 1, 1951, as Psychiatrist I; that previous thereto he had been employed in a State Institution at Cherokee, Iowa, first as a resident physician, and later on, in a "little higher capacity, meaning I got more money." He was employed there from June 27, 1943, until February 2, 1947. From March, 1942, until April 12, 1943, he was employed at a State Hospital in Provo, Utah. From July, 1939, to December, 1941, he was employed at Dixon and St. Charles. He obtained his license to practice on March 6, 1939.

The four witnesses introduced by defendants were all present in Taylor Cottage on September 16, 1953, and saw the incident or a portion of it. Buelah Burdick, a recreational aide, was about eight feet from the doctor and saw the entire incident. She testified

367

that she saw the doctor get up from his desk, and hit Jerry, and knock him down, and while he was down he kicked him. "He hit him with his fist," she said, but she did not observe if it was with an open hand or a clenched fist. She further testified that the doctor kicked him several times and that he then took him by his shirt, picked him up and knocked him down again. "Jerry then got up and started walking across the room, and Dr. Samter kicked him and hit him again; and the last time he hit him, Jerry fell and hit his head on a chair and cut his head open." She further testified that when Jerry got up, blood was pouring down from his head; the doctor went to him, cut his hair and doctored him with the assistance of a nurse. She stated the doctor told her he was protecting Mrs. Whitmer.

On cross-examination, Miss Burdick testified that she had been warned that Jerry was a dangerous or violent patient, but she had never seen him strike at any of the entertainers or recreational workers and he had never made any physical advances toward her. As to Dr. Samter's treatment of the patients, other than on this occasion, she said "he was always co-operative, and helped her take the patients out for fresh air." Miss Burdick testified on rebuttal that, "Jerry did not go back toward Mrs. Whitmer."

Mrs. Gladys Whitmer, who was seated at the piano with her back to the audience, testified that Jerry walked past her, took a swing at her and she just ducked and kept on playing. She heard "kind of a commotion" and looked over her right shoulder and Dr. Samter had hold of him. She could not tell whether he struck him; Dr. Samter was either pushing or striking the patient. On cross-examination she said she did not see it at all; that Dr. Samter was very angry and that she knew Jerry was dangerous and that she had heard of him hitting other people, but

she did not think he was so hard to handle. She further testified that Dr. Samter had been very kind to the patients.

June Dunning, a practical nurse, was at the door letting company out and in; returned, and "saw Dr. Samter give Jerry a whirl around, and a shove around, and he fell broadside and he hit his head on the floor." She testified the doctor treated him, and that "Jerry must be in his fifties, 55, 56, and she believed he would weigh 150 pounds and was nearly six feet tall." She further testified that in her opinion Jerry was a dangerous patient and that on one occasion at least two years back he was put in seclusion. She corroborated Miss Burdick's statement that the doctor had generally been kind toward the patients, treated them to pop and tobacco and showed them lots of consideration.

Lucy Fairbank, the other Department witness, had come into the room when the activity was going on. She testified that the patients at this hospital were mentally ill, and that Taylor Cottage "is what we describe as nice, old men, about half of them are in bed, and the rest of them are sitting in the Day Room. They are mostly peaceable older men. They are assigned there not only because they are mentally incapacitated, but because they are feeble." She testified that she was talking to some patients about ten feet from the piano when suddenly she saw Dr. Samter approach Jerry and throw him down and seemed to hit him, and then he picked him up. Then he threw him down and kicked him and hit him, and then Jerry either got up, or he picked him up, and then he threw him again. She did not see Jerry land the last time as she was looking at Dr. Samter and asked the doctor what he was doing, reminding him that an employee who struck a patient would be dismissed instantly, to which the doctor replied: "I had to strike him. I

369

would not allow the attendants to do it, but I had to do it. I had to show him." On cross-examination she said she did not see Jerry swing at Mrs. Whitmer, "Jerry was not tussling. Dr. Samter was doing all the action." She further testified that she had seen Dr. Samter on the ward with patients and that he had always seemed to be a very kindly person towards them.

Not one of the seven witnesses for plaintiff was present or saw any part of the occurrence. They were all in accord as to his good character and kind treatment of patients. Five were employed at the East Moline State Hospital and testified to Jerry's habit of grabbing and hanging on to people, his dislike of music and women, four said he had struck at them, and one was knocked off the piano stool and another had to mend quite a few uniforms after Jerry got through grabbing at her. Dr. Hollander, a neuropsychiatrist, in his testimony stated he felt Dr. Samter was justified in the course he took in handling Jerry. One of these witnesses, Nellie Hipskind, stated, "I could not hardly say Jerry is dangerous, only that he grabs people and hangs on them, and then when you try to get him off, he is resistive, and he is so strong, you can't hardly get him away without a little shove. Once in awhile then, he might fall. I never observed Jerry strike anybody." Another of plaintiff's witnesses, Florence Richey, testified that she was well acquainted with Jerry; that he had struck her with force about two years before; and that other than on the one occasion he struck her she never let him get close enough to her after that. Another of said witnesses for plaintiff, Marie Ryan, testified that she was acquainted with Jerry and in answer to a question, "Was Jerry considered a dangerous patient?" she answered, "Well he is very combative." On one occasion about two years before, he hit her with his

370

fist on one side of her face knocking her off the piano stool. Another of plaintiff's witnesses, Evelyn Snider, testified that Jerry had always been difficult to handle and at different times had struck at her. She testified that she saw him strike another patient and that she kept clear of him because she thought he was dangerous.

According to Dr. Samter, when sitting at his desk, about 40 feet away, he saw the mental patient, Jerry Katapodes, swing at Mrs. Whitmer's head. Mrs. Whitmer, a recreational worker, was seated with her back to Jerry and playing the piano. Jerry was moving quickly and when the doctor first observed him he was standing or moving right behind her. About a yard away from Mrs. Whitmer the doctor grabbed Jerry by the neck because he was "afraid the second swing would hit her. The first one missed her, the second would not." The doctor said he did not knock Jerry down, "but I got him down all right by getting him around his neck." He did not remember, but believed he picked him up again as he came back towards Mrs. Whitmer instead of going away. He was perhaps four yards away and more toward the middle line of the room; he moved again toward the piano, facing the doctor who was kicking at him as he was approaching. He came closer and one of the doctor's "round" kicks hit him—"it did not hit him in the leg—it was a kick like done by a soccer player, not straight but round." The doctor said: "It was not intended to strike him at all." Jerry then turned around and ran into the alley leading toward the dining room, the doctor running after and pushing him. After the push Jerry ran three or four more yards, struck a chair, stumbled and fell. The doctor said he did not intend to do any physical harm to Jerry; his purpose was to prevent him from coming back to the piano to hit Mrs. Whitmer. The doctor expressed familiarity with Jerry's

371

previous record, that he had given difficulties of various kinds, was subject to compulsions and obsessions, and when he set his mind on something like taking a Coca-cola bottle from another patient, "he will try it, and will follow this patient." He described Jerry as a "catatonic schizophrenic" type. That the main difficulties he gave the staff were in connection with the recreation department; that he had struck at recreational people and musicians several times; so that it became necessary to pay special attention to him. When obsessed with a particular thing, the doctor stated, it was necessary to take special precautions to persuade him from proceeding toward that particular object.

The manifest weight of the evidence adduced at the hearing before the Illinois State Civil Service Commission has established that the plaintiff was guilty of charges preferred against him, viz.: (a) abuse of a mental patient, (b) conduct unbecoming a State employee, and (c) violation of Rule 25 concerning mistreatment of patients. In fact, the evidence and testimony is uncontradicted, admitted and conceded by Dr. Samter himself, that after he had captured the patient by the neck, knocked him down, kicked him, and completely subdued him, he then pursued the patient after the patient got up from the floor and was leaving the room, and after this pursuit of some six, seven or eight yards, again struck or pushed the patient causing him to fall and incur further injury.

■ From these facts the Commission was well justified in determining that Dr. Samter's conduct was such as to justify his discharge. Dr. Samter, having been entrusted with the responsibility attached to his position as Psychiatrist I, and having dealt with patients over many years, many of whom were not responsible for their actions, was required to have a

background calling for coolness, calmness and conduct and action commensurate with his position. In this instance, he demonstrated a total lack of capacity to deal with the situation. From the record it is apparent that Dr. Samter had previously been dismissed because of his inability to get along with people. His admissions to these prior difficulties appears in his testimony on cross-examination, as follows:

"I left Dixon and St. Charles because I had to leave the state. Mr. Couch wrote the letter to Dr. Murray. Dr. Murray read the letter to me that my services were unsatisfactory, and I could not get along with visitors. I left the State Hospital in Utah because I had some difficulty with a patient, with whom I had a quarrel."

 The Administrative Review Act provides (Ch. 110, Ill. Rev. Stat., 1953, par. 274, Sec. 11, Scope of Review): "The findings and conclusions of the Administrative Agency on questions of fact shall be held to be prima facie true and correct." While it is true that in hearings of this character it is held that the findings of the hearing body must be supported by the evidence, our courts also hold that it is not within the province of the court to disturb the findings of fact made by an administrative agency unless manifestly against the evidence. Logan v. Civil Service Commission, 3 Ill.2d 81; Oswald v. Civil Service Commission, 406 Ill. 506; Illinois Cent. R. Co. v. Franklin County, 387 Ill. 301; Foreman v. Civil Service Commission, 7 Ill.App.2d 122; Martin v. Civil Service Commission, 7 Ill.App.2d 128; Watkins v. Civil Service Commission, 7 Ill.App.2d 140; Nolting v. Civil Service Commission, 7 Ill.App.2d 147; and McCaffery v. Civil Service Board, etc., 7 Ill.App.2d 164. In these five recent cases the Appellate Court for the First District had occasion to canvass the Illinois decisions upon the functions, respectively, of the Civil Service

Commission and a trial court in assaying evidence of misconduct. As said in Nolting v. Civil Service Commission, supra, p. 163:

"The Civil Service Commission is not a judicial tribunal even though it has been called 'quasi-judicial' in the sense that its findings could be examined on certiorari. The hiring and discharging of employees in the civil service is still an executive function.

"In appeals from a Civil Service Commission there should be recognition by the courts that the relationship of the executive department to its employees is involved and that the discipline of an entire department may be affected."

These five cases hold that whether the questions of fact are as to what occurred or are as to the gravity of the offense even if the employee's version of the occurrence is taken as true, a trial court may not disturb the action of the Commission unless it is without support in or contrary to the manifest weight of the evidence. We feel that there is substantial testimony in this record to suport the findings and conclusions of the Civil Service Commission, and that such findings were not against the manifest weight of the evidence.

It was error for the circuit court to set aside the findings of the Civil Service Commission and to restore appellee to his status as Psychiatrist I in the East Moline State Hospital. The judgment of that court is reversed, and the decision and findings of the Civil Service Commission of Illinois are affirmed.

Judgment reversed.

DOVE, P. J. and CROW, J., concur.