Wellington Martin, and Anton Topinka, Appellees, v. Civil Service Commission of City of Chicago, Stephen E. Hurley, President, and Albert W. Williams, Member of Civil Service Commission, Appellants.

**Gen. No. 46,501.**

First District, Second Division.

September 20, 1955.

Rehearing denied October 25, 1955.

Released for publication October 25, 1955.

128

John J. Mortimer, Corporation Counsel of City of Chicago, and John C. Melaniphy, Acting Corporation Counsel of City of Chicago, for appellants; L. Louis Karton, Head of Appeals and Review Division, and Arthur Magid, Assistant Corporation Counsel, both of Chicago, of counsel.

Euclid Louis Taylor, of Chicago, for appellees; William C. Wines, of Chicago, of counsel.

PER CURIAM.

Plaintiffs, Wellington Martin and Anton Topinka, patrolmen in the Department of Police in the City of Chicago, filed this action under the Administrative Review Act to review two orders of the Civil Service Commission finding them guilty of misconduct and ordering them discharged from their positions. Separate charges and specifications had been filed with the Commission against each plaintiff. By stipulation of the parties the cases were tried together. The Commission, however, entered a separate finding and decision in each case. The trial court after a hearing entered an order reinstating each of the plaintiffs on

the ground that the findings and decision were not supported by the record and were against the manifest weight of the evidence. The Commission appeals from these findings.

It is the contention of the Commission (1) that the findings were fully sustained by the evidence; (2) that the misconduct charged against plaintiffs and established by the evidence was of sufficient seriousness to constitute adequate cause for the orders of discharge; and (3) that the Commission has no power to fine or suspend but only the power to discharge.

The trial court prior to the entry of the order complained of made an oral statement. It is as follows:

". . . I have carefully read the entire record in both cases. I find that the findings of the Civil Service Commission of the City of Chicago are manifestly against the weight of the evidence.

"In both cases there was some evidence of foolish-, ness, but neither is there evidence of culpability.

"The penalty imposed by the order of the Civil Service Commission in discharging and removing the respondents from their positions with the Police Department is so severe that I would regard it as cruel punishment.

"In my opinion, an order taking away a man's means of livelihood, together with the various benefits going with it, is much more severe than a fine or imprisonment.

"For that reason, I consider it error for any tribunal or any other judicial body to deprive a man of his livelihood. . . ."

It is apparent from this statement that the court concluded that there was evidence to sustain the charges against the plaintiffs but was of the opinion that the penalty was too severe. The issues raised on this appeal are therefore substantially the same as those involved in the case of Walter G. Nolting v. Civil Service Commission et al., 7 Ill.App.2d 147.

130

The relevant facts revealed by the record as to plaintiff Anton Topinka are that he had been a police officer for twenty years. On January 8, 1953, at about 7:00 p. m. he arrested one Robert Moore on complaints that Moore had committed sex crimes against children. Another officer, Dan Crotty, was with him driving the squad car. Moore, after his arrest, was placed in the back seat of the car and Topinka sat with Crotty in the front seat. Moore said that while he was being driven to the station he asked Topinka to get him a lawyer. Topinka asked him if he had any money. He told him he had $130 and Topinka asked to see it. Moore took $130 out of his pocket and handed it to Topinka who counted it. Topinka told Moore he would take the money, get him a lawyer and see what he could do. Topinka, when he testified, denied that there was any conversation in the squad car regarding the $130; that he offered to get Moore a lawyer, or that he took any money from him. On direct examination Officer Crotty said he did not hear any conversation about $130; did not see Moore hand any money to Topinka, and nothing was said about getting a lawyer for Moore. However, on cross-examination Crotty admitted that there was some talk about a lawyer and that Topinka talked to Moore about money while riding in the squad car. He further stated that Moore knew he was wanted by Officer Martin and that he had money for a lawyer. He said that he and Topinka searched Moore at the time of the arrest, found no gun on him, but that he had something in his pocket which may have been a pocketbook. Moore in testifying said that he was searched again when he entered the police station. Topinka was present. Moore had only forty-two cents in his pocket at that time. After giving the desk sergeant the usual information as to his identity and address he was taken to a cell. The next day he sent a message by the turnkey to Topinka telling him he wanted his $130. Topinka came and Moore asked

him about the money. Topinka told him to take it easy and everything would be all right. Moore did not get his money. Subsequently Moore said after he had been taken before the other plaintiff, Wellington Martin, a juvenile officer, where he had been identified by certain children who accused him of sex charges, he again talked with Topinka. Topinka asked him if he was scared. He told him that he was not going to take anything from him, only try to help him. Topinka then left and went to the front part of the station, got an envelope and showed it to Moore and told him that his money was in it and he was going to put it in the safe until the next day for safekeeping. Moore assented. The next morning, January 9, Topinka came to Moore's cell and handed him a brown envelope which contained only $90. Moore asked Topinka about the other $40. Topinka said that he had to divide it between four different people, one of them a lawyer, and three others, each getting $10. Moore never saw Topinka again after that.

Topinka testified that when he brought Moore to the station he told the desk sergeant that he had the man for whom the "wanted" message had been sent out by Officer Martin. On the way to the lockup Moore told him he had $90 on his person and was afraid it would be stolen if he fell asleep. Moore gave him the $90 to keep. He took the $90, put it in a police envelope and placed it in the safe in the front part of the station. Before anything else could be done he was sent out on a call with his partner, Officer Crotty, because at that moment a man came into the station complaining that he had been threatened. He and Crotty went out in the squad car on a call in response to this complaint. He later returned and did nothing about inventorying the $90 he had left in the safe. He did nothing the next day as he had forgotten about it. On the following day, however, he did recall it and told Sergeant Sheahan about it. He made out a prisoner's receipt which

was signed by the sergeant and delivered the receipt to Moore. He denied that he gave Moore the $90 or that he told Moore he had divided the remaining $40 among four different people.

On cross-examination Topinka admitted he never made any report to his superior officer with regard to the complaint which he claimed was made just after he placed the $90 in the safe. He admitted he was familiar with the rule which required that he make a report of all complaints. He also admitted that he was familiar with the rule requiring a police officer to turn over all property discovered or taken from a person arrested to an appropriate officer without delay; that forty-five hours elapsed between the time he received the $90 from Moore and the time he turned it over to Sergeant Sheahan to have it inventoried. He admitted that it was not the normal thing to put $90 in an unlocked safe; that it was wrong but that because of the complaint made by the man he failed to turn it over to the desk sergeant. He admitted that it was not customary for an arresting officer to take money from a prisoner when he was putting him in the lockup and that the lockup keeper should do it. Sergeant Sheahan said that Topinka came to him with an envelope and told him that he had some money he had taken from a prisoner two days before and had forgotten to turn it in.

Robert E. Ryan, a captain, testified that when a person is arrested and brought to the station to be locked up, according to the rules the proper procedure is that such person is searched by the lockup keeper with the arresting officer standing by until the search is completed. The lockup keeper takes all valuables from the prisoner. Any money is turned over to the desk sergeant who issues a receipt to the prisoner with the amount on it. At the scene of the arrest the arresting officer makes an immediate search for concealed weapons. Ryan also said that at times in a busy station the

arresting officer, if the lockup keeper is otherwise engaged, might take any money and deliver it to the desk sergeant.

The relevant facts pertaining to plaintiff Wellington Martin are that Moore, shortly after he was placed in a cell by Topinka, was taken out and brought up to the juvenile office on the second floor of the police station. Here he saw Martin. Martin accused him of exposing himself to little children. Some of the children and their parents who had made complaints were there and identified him. Martin told him, "You are going to the penitentiary now, I will see you go to the penitentiary." After the people left Martin took a statement from Moore. Martin asked him why he gave his money to Topinka. He told Martin he wanted to. Martin said that Topinka couldn't do him any good, that he (Martin) was the arresting officer and he could do more for him than Topinka. Martin told him he could get his charges reduced. Moore said, "Okay." He was then taken down to the cell. A little later Martin came and asked Moore if he had his money. Moore told him that he did not and Martin said, "Well, get it." Martin also asked if he needed anything and Moore said, "A couple of dollars." Martin gave it to him and he gave it to the turnkey to call Topinka for him. After he received the $90 from Topinka, Martin came and asked if he had the money. Moore handed him the $90 in the brown envelope. He told Moore that he would see what he could do. On January 10 Martin saw Moore and asked him about the $90. Martin said he was supposed to divide it among several people and that it would be taken care of. He said he never received any part of the $90 back from Martin.

Moore was later taken to the County Jail. On January 12 Martin came to see him and asked him if he had any money coming from where he had worked. Moore told him that he had $57.13 coming and asked Martin to obtain the check. Martin obtained the check,

134

had Moore endorse it, and then cashed it. He retained $7.13 and inventoried the balance of $50 in Moore's name at the County Jail.

Moore was tried and convicted of committing sex crimes against children and was sentenced to the penitentiary. After his conviction he wrote Martin on January 14 telling him that since he did not get his charges reduced to misdemeanors he would like for him to return the $90 and if he did not do so he would complain to the judge. Moore never heard from Martin and on January 22 he complained in writing to the Commissioner of Police.

Martin testified that he had been a police officer since January 22, 1946, and in November of 1946 became a juvenile officer; that prior to entering the police service, during World War II he had been in the United States Army; that while on the force he received a merit citation for outstanding service in a drive to curb juvenile delinquency. He said he first met Moore in 1950 in connection with a complaint from a parent that Moore had been molesting her two boys. He was tried and convicted on this charge. Subsequently Moore was tried and convicted on a similar charge. Prior to January 8 he had received complaints that Moore was again molesting children. He sent out a "wanted" message for Moore. He was informed on the evening of January 8 that Moore had been arrested and was being held for him. He had the parents and the children who had made the complaint come into his office. He then brought Moore in. The children identified Moore as the one who had committed certain sex acts. He made further investigation and found that there were other complaints against Moore. Moore finally admitted the charges against him and signed six separate confessions. Martin testified before the grand jury and at the trial on the charges against Moore.

Martin denied ever having had any conversation with Moore about giving money to another officer on

135

the night he was arrested or any other time. He denied that Moore ever told him he had $130 or had given any other officer any money, such as $40. He denied ever having received $90 from Moore. He said that when Moore was in the County Jail he told him he had no money and that he had a check coming from his employer and that he requested Martin to get it for him. Martin agreed to do so and obtained the check, had Moore endorse it and cashed it. The check was in the sum of $57.13. At the time this was done a lawyer was there. Martin asked the lawyer to change a ten-dollar bill, which he did. From this change he gave Moore $7.25 before taking the check and having it cashed. He cashed the check on January 12, the day of Moore's trial. He kept the $7.13 to repay him for the $7.25 he advanced to Moore. At the police station he inventoried $50 of the proceeds of the check, put it in an envelope, put Moore's name and his own name as arresting officer on it, placed it in the safe and told the desk sergeant Coakley that he had done so. He signed the name of Donald Coakley to the inventory for the $50, which was made out at the station. He did this because the sergeant was busy. He did not know it was against the rules. An examination of the inventory which was placed in evidence indicates that there is a very decided difference in his handwriting in signing his own name and in signing Sergeant Coakley's name. The next day he took the money out of the safe, took it over to the County Jail and there had it inventoried in the name of Moore. He denied that Moore told him to keep $5 for cashing the check or that he took or kept any money for his services in that respect. He stated that the first he knew that Moore claimed he had given $90 to him to reduce the charges to a misdemeanor was when Moore filed the written charges with the Commissioner against him. He was questioned about this and submitted a three-page report to his commanding officer. No statement was made

in the report about the $7.25 he had given in cash to Moore. The first statement as to this was when he testified at the hearing on the charges. Captain Ryan testified it was against the rules for an arresting officer to sign the desk sergeant's name to an inventory but that sometimes in a busy station this was done.

The Commission found that the evidence sustained the charge against Officer Topinka that he failed and neglected to turn over immediately the $90 he obtained from Moore, a prisoner under arrest, to the appropriate officer or person, in violation of the rules and regulations of the Police Department. The Commission further found that the evidence was insufficient to warrant a finding that Topinka was guilty of the remaining charges against him so as to warrant his dismissal from the service. The Commission pointed out that Topinka testified to a forty-five hour delay in the turnover and the inventory of the $90 he received from Moore and that while there was a conflict in the evidence as to whether Topinka took and withheld an additional $40 from Moore, respondent's furtive and irregular handling of the $90 lent color to the other charges. They decided, however, that it was unnecessary to resolve the conflict in view of its finding of guilty on Topinka's failure to make a timely inventory of the $90.

The Commission found with respect to Officer Martin that the evidence sustained the charge that he had falsified a police record by placing thereon the signature of another officer, Sergeant Donald Coakley, without his consent and that this constituted conduct unbecoming a police officer and warranted his discharge. The Commission found that the evidence was insufficient to warrant a finding that Martin was guilty of the remaining charges against him so as to warrant his dismissal from the service on those charges. The Commission pointed out in the report that the evidence concerning Martin's misconduct with respect to inventorying the $50 was not disputed; that while there

137

was a direct conflict in the evidence as to whether Martin accepted money from Moore for services performed in connection with cashing Moore's check and while respondent's irregular method of handling the proceeds of Moore's salary check and his unusual solicitation and effort in that regard in behalf of one whose prosecution he was assisting did not inspire confidence, it was unnecessary to resolve that conflict in view of its finding of guilty on the issue of signing Sergeant Coakley's name to the inventory without his knowledge or consent.

█ As we pointed out, it is apparent from the oral statement made by the court prior to the entry of the order that the real basis for the decision was that the court considered the punishment of discharge too severe. An examination of the record clearly reveals that in each case the finding of the Commission on which it based the order of discharge was amply supported by the evidence. It was, therefore, not within the province of the trial court to disturb these findings. Drezner v. Civil Service Commission, 398 Ill. 219.

█ The question then turns upon the issue as to whether the misconduct of the plaintiffs was trivial and amounted to mere "foolishness." It is important to the honest and efficient administration of the Police Department that its members act with great care in regard to personal property of value found in the possession of a person taken into legal custody. Any relaxation of discipline in that sphere of police activity can easily result in the demoralization of the Police Department and its members and in the loss of public respect for law enforcement. The very fact that Moore was an unfortunate character afflicted with abnormal sexual tendencies should have tended to render the plaintiffs more, rather than less, careful and scrupulous in their dealings with him and with his property. The Commission in each of its findings and decisions

138

aptly pointed out that Moore's background of previous convictions and the nature of the sex offenses for which he was arrested made him peculiarly vulnerable to impositions of the character charged against these plaintiffs. In the cases of In re Philip Goodman (1941), 377 Ill. 178, and In re Arnold B. Harris (1943), 383 Ill. 336, attorneys were disbarred where they worked in collaboration with police officers and obtained fees by duress from individuals such as Moore who were charged with sex crimes. It is true these police officers were not charged with extorting money from one accused of perversion, but it was proved that they violated rules of the department designed to prevent such extortion or "shakedowns." The prevention of such venal acts is one of the responsibilities of the Chief of Police and the Commission. This can be done only by strict enforcement of the rules of the department.

The problem of proper discipline, morale and law enforcement by the Police Department is one directly affecting the administration of justice. The police have the responsibility of apprehending those who violate the law and assisting in the preparation of the cases that are to be brought before the courts for trial. A corrupt and dishonest police officer can persecute the honest and assist the guilty to avoid prosecution. As a result of such dishonesty and corruption, all who are connected with the administration of justice can be brought into disrepute. In this the people of the community and all those connected with the administration of justice are vitally interested.

While the Commission found Topinka guilty only of the charge of neglecting to turn over an arrested person's property to the appropriate officer without delay, and found Martin guilty only of the charge of signing Sergeant Coakley's name to the inventory receipt without the latter's knowledge or consent, it was perfectly proper for the Commission to consider

139

their conduct in the light of the entire evidence in coming to the conclusion that they should be dismissed from the service.

Viewed in this light, we believe the charges that the Commission found were sustained by the evidence, were not trivial and did not amount to mere "foolishness." The pertinent issues involved in this case are decided by our conclusions in Walter G. Nolting v. Civil Service Commission of the City of Chicago et al., 7 Ill.App.2d 147. We, therefore, adopt those conclusions as conclusive of the issues in this case. The judgment of the Circuit court is reversed and the decision and findings of the Civil Service Commission are affirmed.

Judgment reversed.