Joseph L. Miglieri, Appellee, v. William A. Lee, President, and John J. Ahern and Albert W. Williams, Members of Civil Service Commission of City of Chicago, Appellants.

**Gen. No. 47,306.**

First District, Third Division.

February 28, 1958.

Released for publication April 23, 1958.

John C. Melaniphy, Corporation Counsel of City of Chicago (Sydney R. Drebin, and Harold M. Nudelman, Assistant Corporation Counsel, of counsel) for defendants-appellants.

Korshak and Rothman, of Chicago (Thomas J. Finnegan, and Marshall R. Rothman, of counsel) for appellee.

JUSTICE BRYANT delivered the opinion of the court.

This is an appeal from an order entered in the Circuit Court of Cook county finding that the decision of the defendants, members of the Civil Service Commission of the city of Chicago, was manifestly against the weight of the evidence, and ordering reversed and quashed the discharge of the plaintiff, Joseph L. Miglieri, from his position as patrolman in the classified service of the Department of Police of the city of Chicago.

The action in that court was under the Administrative Review Act to review the order of the defendants, acting as the Civil Service Commission of the city of Chicago, in which they found that the plaintiff, a patrolman in the Chicago Police Department, was guilty of conduct unbecoming a police officer and of immoral conduct in that he had sexual intercourse with a 15-year-old girl, and ordered him discharged from his position. The appeal puts into question whether the action of the commission was contrary to the manifest weight of the evidence.

The plaintiff at the time of the filing of the complaint was 29 years old, married and divorced and the father of a child six years old. He was at that time residing with his mother and father at 7150 S. Euclid Avenue, Chicago, Illinois. He had successfully passed the necessary examinations and was on May 5, 1955 duly certified and appointed a patrolman. On October 22, 1955, while riding a motorcycle in line of duty, the plaintiff had a collision and sustained severe injuries and had not performed his duties as a patrolman since that time, and wore a body cast from October 25, 1955

until January 29, 1956. Before May 5, 1955, when the plaintiff was appointed a patrolman of the city of Chicago, he had worked for seven and a half years in the Bureau of Sanitation of the city of Chicago as a truck driver.

The complaining witness, Barbara Sue Arnold, resided at the House of the Good Shepherd in Milwaukee, Wisconsin. She testified at the hearing before the commission that she was then 15 years old. On December 6, 1955 the plaintiff first met Barbara Arnold at his home at 7150 S. Euclid Avenue, where his brother brought her and introduced her as Jerri Page to both the plaintiff and his mother. The plaintiff, Joseph L. Miglieri, and his brother Peter Miglieri were both known by the last name of Miller. Peter Miglieri was a salesman and was frequently out of town. The record indicates that between the December 6, 1955 meeting and December 27th, Barbara Arnold frequently called the home of the plaintiff and asked for Pete, his brother; that on several occasions when Pete was not there plaintiff had conversations with her.

On December 27, 1955, slightly over two months after plaintiff had been injured in the collision and exactly three weeks after the plaintiff had met Barbara Arnold, Barbara Arnold called plaintiff at his home and told him that she was about to be put out of her hotel, the Paradise Arms Hotel at 4114 W. Washington Boulevard, where she had been registered as Mrs. Frank Morretti, and asked if he would lend her money and if he would come over later that evening to pick her up and help her move. That evening, on December 27, 1955, the plaintiff and his brother Frank Miglieri went to the Paradise Arms Hotel and the plaintiff loaned Barbara Arnold $15, with which she paid her hotel bill. The bell-boy brought down her baggage. It was placed in the car of plaintiff, which was driven by his brother Frank Miglieri. They drove

to the Mayflower Hotel at 6125 S. Kenwood Avenue. This hotel was recommended to Barbara Arnold by the plaintiff on the basis that it was a reasonably priced hotel and that he had lived there for a considerable length of time before he had become a police officer—some seven or eight months, at least. He knew all of the personnel of the hotel, including the clerks and the bell-hops, from this association. This time Barbara Arnold registered under the name of Jerri Miller, being the surname commonly used by the plaintiff. She testified that she also had in her possession a false birth certificate in the name of Jacksie Page, given to her by a friend by the name of Jack Abess, which showed that she was 19 years old; that she was at that time wearing makeup and high heels and generally intended to create the impression that she was 19 years old. She was assigned to the same room which the plaintiff had occupied during part of his tenancy in the hotel, No. 124. The plaintiff took her bags to her room and stayed there 20 minutes. She remained in that hotel until January 8, 1956.

She testified that the plaintiff instructed her that the bell-boys would come to her room and get her and take her to the rooms when a man would want her, and that the bell-boy would tell her how much to charge, and that she should always go to the man's room and never take anyone into her room. This instruction is denied by the plaintiff. She further testified that the bell-boys did come and take her to the rooms of men; that she was compensated for the calls she made and that she gave 40 per cent of what she got to the bell-boys and kept the rest, and that the instruction to divide the money that way was given to her by the plaintiff. The bell-boys both testified that they never met the girl and no such arrangement existed. One of the women clerks was certain that no one had visited the girl's room, but said that she was a little bum and

548

was only 15 years old and that she had many telephone calls from men and would come out and get a cab and was impatient if the clerk did not have a cab waiting for her, and then would somewhat later return to the hotel.

The second part of the charges relates to the alleged act of sexual intercourse which took place between Barbara Arnold and the plaintiff. Barbara Arnold states that on January 3, 1956 she was visited in her room by the plaintiff for an hour to an hour and a half and that she had sexual intercourse with him at that time. There seems not to be the slightest doubt of the meeting of the plaintiff and Barbara Arnold on that date. Barbara Arnold places the date because she knew that she was busy on January 1st and January 2nd, and says that the episode on January 3rd with the plaintiff took place about 8 or 8:30 p. m. Plaintiff says that Barbara Arnold called him on that day and asked him to come over because she would pay him back the $15 which she had borrowed from him on December 27th. The manager of the hotel, Jack Pasch, is quite certain that he did not see the plaintiff in the hotel on the night Jerri Miller was registered—that is, on the night of December 27th, but recalls having seen the plaintiff in the hotel a few nights later, and places the time at about 9 o'clock. The brother, Frank Miglieri, stated that he drove the plaintiff to the Mayflower Hotel to see Jerri Miller (Barbara Arnold) on January 3, 1956, and he didn't know what time of day it was, but he was quite sure it was not 8 or 9 o'clock that night. The plaintiff went into the hotel and came out with Barbara Arnold, and the plaintiff and the witness, Frank Miglieri, took her to Powers Restaurant on 63rd street and they had dinner there. They then drove back to the Mayflower Hotel and the plaintiff took her into the hotel and came out a few minutes thereafter. The two clerks recalled seeing the plaintiff

549

in the hotel about 3 p. m., which was a shift-time change for the clerks. The one that was coming on duty recalled calling Room 124, where Barbara Arnold was ensconced as Jerri Miller, and that she came out and joined the plaintiff in the lobby and they went into the coffee shop, and later they came out of the coffee shop. But she was sure that the plaintiff did not go into the room of Barbara Arnold.

Plaintiff's testimony on direct examination was that he went to the hotel at about 3 or 3:30 p. m. and asked the clerk to call Jerri from her room and that she came out and asked him to take her to dinner; that his brother Frank drove them to Powers Restaurant; that they were there about 20 or 25 minutes and then came back to the hotel and she did not have any money to give him; that she started laughing when they walked into the hotel and he got mad and walked out and did not go into the room with her. But almost immediately thereafter, on continuing direct examination, he also testified: "I was not in the room with her at either time—when I walked in to ask her to go to dinner, or when I went back—for more than five minutes." When the complaint was first being investigated the plaintiff made a statement in the State's Attorney's office, at which time Mr. Thomas Lyons, Chief of the Uniformed Division of the City of Chicago Police Department, was present. Mr. Lyons testified that plaintiff admitted that he visited Barbara Arnold at the Mayflower Hotel, took her to dinner, and that after they returned to the hotel from dinner he went to her room with her and she offered him a drink, which he refused, and he stayed there about 15 minutes.

As impeachment of the statement of Barbara Arnold, plaintiff introduced evidence that theretofore she had testified before Judge Morrissey of the Municipal Court in regard to the episode of January 3rd and had sworn under oath that she had not had sexual rela-

tions with the plaintiff on that date. The complaining witness testified that subsequent to that testimony she had appeared before Judge Thomas E. Kluczynski in the Criminal Court of Cook county and she had testified there in regard to the sexual relationship on January 3, 1956 in the same manner that she had testified before the commission. She explained the discrepancy in her testimony before Judge Morrissey and before Judge Kluczynski and the commission upon the basis that as a part of the investigation which followed her apprehension she was on one occasion in the Sex Bureau at 26th and California, and that one of the men, who was being investigated because of her, said that anything she said against anybody could be used against her, and told her to keep her mouth shut.

Various police officers and the complaining witness testified concerning the circumstances existing at the time the testimony was given. It was thus developed that the Chicago Police Department had been informed that Barbara Arnold was missing from the House of the Good Shepherd in Milwaukee, Wisconsin, and that there was a possibility a police officer would be involved. On February 10, 1956 one of the policewomen of the city of Chicago arrested Barbara Arnold at 1244 N. Dearborn Street, a different part of town from any of the other two hotels where Barbara Arnold had been staying. At this hotel she was going under the name of Jerri Sennmarco, and a Mr. Sennmarco registered her there but he was not living with her. She was at the Audy Detention Home, a juvenile home, from February 10th to February 17th and was questioned each day. On February 16th the first conversation concerning the involvement of a policeman took place. After these conversations with her some 12 or 14 people were indicted. After the first mentioning of the police officer she was taken to the Bureau of Identification and shown pictures and

551

picked out the picture of the plaintiff. Subsequent thereto, under the direct view of the Chief of the Uniformed Division of the Police Department, a showup was held and out of eight or nine men in civilian clothes she picked the plaintiff as the person with whom she had had sexual relations. It is to be noted that when she testified before the Civil Service Commission she was not even a resident of the State of Illinois, having been returned to Milwaukee, Wisconsin, from whence she came. It is also to be noted that she testified that the plaintiff at no time used any force with her whatsoever and never compelled her to do anything that she did not want to do.

There was further evidence relating to the credibility of the plaintiff. When the plaintiff gave his statement before Thomas Lyons, Chief of the Uniformed Division of the Police Department, he stated that he had received a call from Barbara Arnold asking him to visit her at the Parisian Club, a night club on North Clark Street, and in response to that call he had gone there and saw her on the stage. At first, however, he had denied going into the Parisian Club in response to a telephone call from Miss Arnold and said that he had gone into the Parisian Club because he was restless.

As corroborative evidence that sexual intercourse could not have taken place on January 3, 1956, the plaintiff urged that it would be physically impossible because he was in a body cast. He explained that the body cast reached down to the roots of his penis. The testimony of Barbara Arnold was that the lower part of the cast was only an inch or two below his navel, and she explained in detail the positions taken to consummate the act. The cast was admitted into evidence and, at the suggestion of plaintiff's counsel, plaintiff, counsel and commission retired to a room and the plaintiff stripped and the cast was placed upon him

552

again and the commissioners inspected it. It was shown that a part of the cast had been cut out because it gave the plaintiff a belly-ache.

This testimony is conflicting and it involves questions of the interests of the various witnesses, their demeanor as they testified and their credibility, of which the commission is the judge.

 The power of the trial court in proceedings under the Administrative Review Act is clearly set forth in the case of Logan v. Civil Service Commission, 3 Ill.2d 81, as follows:

"Under the Administrative Review Act the findings of the adminstrative agency on questions of fact are prima facie correct (Ill. Rev. Stat. 1953, chap. 110, par. 274), however, they may be reviewed to determine whether they are supported by the evidence, and may be set aside only if they are against the manifest weight of the evidence. (Drezner v. Civil Service Com., 398 Ill. 219; Secaur v. Civil Service Com., 408 Ill. 197; Harrison v. Civil Service Com., 1 Ill.2d 137),"

and was considered and passed on by this court in McCaffery v. Civil Service Board, 7 Ill.App.2d 164, in this manner:

"The trial court has only the power to consider the evidence to determine whether the findings and decision of the Civil Service Board are against the manifest weight of the evidence. Nor can either this court or the trial court substitute its judgment for the judgment of the Board."

The entire position of the trial court, in reviewing under the Administrative Review Act the findings of the administrative trial board, is carefully considered in Danner v. Board of Fire and Police Com'rs, 15 Ill.App.2d 536 (abst.), including the prima facie nature of the board's finding, the credibility of witnesses, the effect of conflicting testimony and the

obligation of the court to affirm the findings of the board if there is sufficient evidence in the record to support them. The review of the evidence herein indicates that the findings of the commission are not contrary to the manifest weight of the evidence.

Although it does not relate to the legal question as to whether the evidence was such that the finding of the commission was contrary to the manifest weight of the evidence, still the expression in Martin v. Civil Service Commission, 7 Ill.App.2d 128, at p. 139, is a pertinent observation in the instant case:

"The problem of proper discipline, morale and law enforcement by the Police Department is one directly affecting the administration of justice. The police have the responsibility of apprehending those who violate the law and assisting in the preparation of cases that are to be brought before the courts for trial. A corrupt and dishonest police officer can persecute the honest and assist the guilty to avoid prosecution. As a result of such dishonesty and corruption, all who are connected with the administration of justice can be brought into disrepute. In this the people of the community and all those connected with the administration of justice are vitally interested."

The judgment is reversed and the cause remanded with directions to quash the writ.

Judgment reversed and cause remanded with directions.

BURKE, P. J. and FRIEND, J., concur.