LEON FELDMAN, Plaintiff-Appellant, *v.* IRENE FITZPATRICK, Defendant-Appellee.

(No. 56491;

First District (1st Division)—April 16, 1973.

William S. Keck, of Herman & Tannebaum, of Chicago, (Sidney Z. Karasik, of counsel,) for appellant.

Hubbard, Hubbard, O'Brien & Hall, of Chicago, for appellee.

Mr. PRESIDING JUSTICE BURKE delivered the opinion of the court:

An automobile in which plaintiff was a passenger, driven by his 16-year-old son, Richard, was struck in the rear end by an automobile owned and operated by defendant, Irene Fitzpatrick.

Plaintiff alleged that as a result of the occurrence, he sustained "severe and permanent injuries" and damages in the amount of $125,000.

At the conclusion of all the evidence, the court directed a verdict in favor of plaintiff on the issues of contributory negligence and defendant's negligence. The case was submitted to the jury on the issues of causality and damages. The jury returned a verdict in favor of defendant and judgment was entered thereon. Plaintiff appeals.

Plaintiff testified that on May 15, 1965 at 5:00 P.M. he and his son, Richard, were involved in an automobile accident with the car of defendant, Irene Fitzpatrick. He testified that at the time of the occurrence he was riding as a passenger in the front seat and his son, Richard, was driving the vehicle. The Feldman automobile, northbound on Ridge Avenue in Chicago was stopped in obedience to a red traffic signal at Lunt Avenue. Plaintiff testified that defendant's car, which also was proceeding northbound on Ridge Avenue in the same lane as the Feldman car, struck the rear end of the Feldman car. Plaintiff testified that the impact of the vehicles caused him to strike his head on the windshield, as a result of which he became unconscious for half a minute.

Plaintiff testified that the police department was notified and that a police officer arrived at the scene and investigated the accident. After the investigation plaintiff's son drove him home. Plaintiff stated that after the accident he felt "bad" and his "head was hurting."

Plaintiff testified that later that evening his brother and sister-in-law came over to his house and took him to see Dr. Sidney Alpert. Dr. Alpert recommended that plaintiff enter Mt. Sinai Hospital the next day where plaintiff was hospitalized from May 16, 1965 to May 28, 1965. Plaintiff testified that after his initial hospitalization, he was hospitalized on different other occasions and lost a substantial amount of time from work.

On cross-examination, plaintiff testified that after he struck his head on the windshield, he had a bruise in the right forehead area. He believed the bruise was discolored and that the bump or mark would be visible to persons observing him after the accident.

Plaintiff's son testified that as a result of the impact of the vehicles, he was "thrown back and forwards against the steering wheel" and that subsequent to the accident he was treated by Dr. Alpert.

On cross-examination Richard Feldman testified that he had been a plaintiff in the lawsuit and had taken a non-suit approximately ten or fifteen minutes before he was called to testify as a witness in his father's behalf. He further testified that after the accident, he did not see any marks on his father and that his father did not respond to the investigating police officer's inquiry concerning whether anyone was injured. Richard Feldman testified that the Feldman car was damaged in the rear end but was unable to specify the exact area which was allegedly damaged and stated that the car was not repaired after the accident.

Dr. Merrell R. Reiss, a physician and neurologist associated with Mt. Sinai Hospital, called by plaintiff, testified that he examined an E.E.G. (electroencephalogram) taken of plaintiff on May 19, 1965. Dr. Reiss testified that his interpretation at that time was an "abnormal E.E.G." and that this might indicate an irritative response to an injury. Dr. Reiss further testified that he interpreted a subsequent E.E.G. of plaintiff taken in August 1965 and that at that time plaintiff's E.E.G. was normal. In response to a hypothetical question propounded by plaintiff's counsel, Dr. Reiss stated that he was of the opinion that the abnormality he discovered at the time of the first E.E.G. was "probably secondary to or caused by the injury."

On cross-examination of Dr. Reiss, the following occurred:

> "Defense Counsel: Doctor, as I understand it, your active professional services in relation to Mr. Feldman was reading these two electroencephalograms?

The Witness: That is correct.

Defense Counsel: You performed no neurological consultation or other services?

The Witness: That's correct.

Defense Counsel: Probably, as a matter of fact, you didn't even see the gentleman personally?

The Witness: Probably not. I could have in the laboratory, but probably not.

* * *

Defense Counsel: Is this the type of thing that might be caused, shall we say, by a blow to the head in a football game or falling down and bumping your head?

The Witness: It usually is caused by something where there is more than—in other words, if there is a bump on the head ordinarily the brain is not involved in any way. It would suggest that whatever injury there is, while it may not be anything of a serious or mortal nature, has had some effect, some mild effect at least, on the brain substance underneath.

Defense Counsel: Can an irregular E.E.G. be caused by anything other than trauma, stress, or strain?

The Witness: Certainly. It can, yes."

Dr. Sidney Alpert testified as a witness in plaintiff's behalf that he saw the plaintiff at his office on the evening of May 15, 1965 and at that time Dr. Alpert suggested plaintiff enter the hospital. Dr. Alpert testified that plaintiff gave a history of having been involved in an automobile accident and that during his hospitalization, plaintiff complained of severe headache, severe stiffness and soreness in his neck and across his shoulders, being very tense and nervous, abdominal pain, nausea, and vomiting.

On cross-examination Dr. Alpert testified that his only objective finding during the first examination of plaintiff was "spasticity in the neck, shoulder area and upper back." The witness further testified that he signed and approved a summary of the hospital records concerning plaintiff dated May 16, 1965 which stated that plaintiff's "neck was supple and non-tender" and that plaintiff was "somewhat anxious and alert, but in no acute distress" and that "there were no remarkable physical findings" concerning plaintiff. Dr. Alpert stated that the hospital summary of May 16, 1965 was prepared by a medical student and that he did not necessarily agree with the findings. The witness testified that he would have signed the medical summary of May 16, 1965 notwithstanding the fact that he disagreed with the stated findings.

Dr. Harry H. Garner, a physician specializing in psychiatry and neu-

rology called as a witness for plaintiff testified that plaintiff was referred to *him for consultation* by Dr. Sidney Alpert. Dr. Garner testified that after treating plaintiff and examining his medical history he was of the opinion that there was a direct causal relationship between the accident which plaintiff experienced and the subsequent symptom syndrome and disability which Dr. Garner diagnosed as a "traumatic neurosis."

On cross-examination, Dr. Garner acknowledged that he was aware that plaintiff had been in a concentration camp during World War II and had immigrated to Israel and then to the United States. In response to a question concerning whether plaintiff's "neurosis" was a pre-existing illness, Dr. Garner stated that plaintiff had all the experiences and part of his personality makeup was such that he was "prone to develop a neurotic reaction under stressful situations."

Defendant Irene Fitzpatrick testified that on May 15, 1965, she was driving her car north on Ridge Avenue in Chicago. As she approached the intersection of Ridge and Lunt Avenues she noticed that the traffic control light for northbound traffic was red, applied her brakes and brought her car to a complete stop. At this time her vehicle was in the lane closest to the curb and the front of her car was two or three feet behind plaintiff's car.

Defendant further testified that after she came to a complete stop, she put her car in neutral gear, and applied the brake. She then leaned over to get sunglasses out of her glove compartment and in doing so she apparently partially released the brake and her car rolled slightly forward and struck the rear bumper of the plaintiff's car. Almost immediately after the impact plaintiff got out of the car and came around to talk to her, to complain that her car had bumped into his car and damaged it. At the time of the conversation, she was in the driver's seat of her car and Mr. Feldman was standing next to her car and she saw no cuts or bruises on his face nor any bump or lump on his forehead. She got out of her car to inspect the vehicles. There was no damage to her car and she did not see any damage to the Feldman car. She further testified that at the time they were looking at plaintiff's car, she did not observe anything of an unusual nature about his actions or appearance.

The witness further testified that the police department was notified of the accident and that when the police officer arrived he questioned her and plaintiff. During the course of the police officer's investigation, he asked if anyone was injured and no one responded affirmatively. She testified that at the time of the investigation, she saw no cuts or bruises on plaintiff's forehead.

The first time she had any knowledge of plaintiff's claim of injury was about ten days to two weeks after the accident when she received

a letter from attorneys representing plaintiff. The witness further testified that subsequent to the accident, she saw plaintiff in the traffic court and at that time she did not observe any marks or bruises on his face and he did not make any complaint of injury to his person.

Chicago Police Officer Lewis Cane, called as a witness by the defense, testified that on May 15, 1965 he investigated an automobile accident at Ridge and Lunt Avenues involving the Feldmans and Irene Fitzpatrick. The accident report, Defendant's Exhibit 1, bore his signature and he had prepared the report on May 15, 1965. The officer testified that the report was "marked property damage and no indication of personal injuries." The officer further testified that if there had been any complaints of personal injuries, he would have marked the report "injury" and would have filled out the back side of the accident report. The witness stated that he would mark on the report a complaint indicating injury if he saw a bump or cut or other indicia of injury even if the person involved indicated that he was not injured.

The defense called plaintiff as an adverse witness under Section 60 of the civil practice act. Plaintiff testified that when he came to the United States, he worked for Hamilton Glass Company and later for Century Industries. He testified that during the period from 1960 to 1965 he was not "sick or injured to any degree." He worked steadily and there were never any injuries to his wife or son that required him to take time off from work. He testified that he was "very happy" in his employment.

At this point, defense counsel proceeded to introduce defendant's Exhibit 2, a letter from Century Industries dated March 1, 1963 which was directed to the plaintiff and which was covered by a stipulation regarding business records. Defense counsel then proceeded to read the following letter to the witness in the presence of the jury:

> "This is to advise you [Leon Feldman] that we are taking official notice of your repeated and excessive absenteeism from work. Further unauthorized absence will require that we replace you with an employee who will be present for work on a full-time basis. A copy of this letter will be forwarded to your union." From Sidney Gold, Director of Personnel.

Plaintiff acknowledged seeing the aforementioned letter and further testified that the same company kept his job open for him for seven months after the accident and finally terminated him in December 1965.

Plaintiff argues on appeal that the uncontradicted testimony of a causal relation between plaintiff's condition of ill being and the accident could not be rejected by the jury and therefore the verdict was against the manifest weight of the evidence.

As this court recently stated in *Apato v. Be Mac Transport Co.*, 7 Ill.App.3d 1099, 1102, 288 N.E.2d 683, 686, a case involving a somewhat similar factual situation:

> "In a negligence action, however, a verdict may be directed as to liability only when liability has been proved as a matter of law. Liability includes both negligence and injury. Whether [plaintiff] sustained an injury was a major issue at the trial. In a negligence action the plaintiff must establish a duty owed by the defendant, a negligent act or omission by the defendant which breaches that duty and a compensable injury to the plaintiff resulting from such breach. (*Lasko v. Meier* (1946), 394 Ill. 71, 67 N.E.2d 162; *Drell v. American Nat. Bank and Trust Co.* (1965), 7 Ill.App.2d 129, 207 N.E.2d 101.) To warrant an assessment of liability, affirmative and positive proof is required that the actionable negligence was the proximate cause of the injury. (*Sansone v. Atchison, Topeka & Santa Fe R.R. Co.* (1967), 83 Ill.App.2d 435, 228 N.E.2d 101.) Even if the jury concluded that the [defendant] was negligent, [plaintiff] would not have been able to recover damages unless the jury also believed that she had been injured as a result of [defendant's] negligence. *Cf. Cohen v. Sager* (1971), 2 Ill.App.3d 1018, 278 N.E.2d 453." *Apato v. Be Mac,* 7 Ill.App.3d 1099, 1102, 288 N.E.2d 683, 686.

The major issues in the instant case were whether plaintiff was injured and whether the negligence of the defendant was a proximate cause of the injury to the plaintiff. Defendant admitted striking plaintiff's car and there was no issue as to the negligence and the trial court correctly directed a verdict for plaintiff on the negligence issue. Indeed, during the course of colloquy regarding plaintiff's motion for a directed verdict, plaintiff's counsel stated:

> "I am not asking the directed verdict as to whether the negligence of which [defendant] was found guilty caused this injury. I don't want that. I think that should always be a jury question, and the nature of the extent of the injury if they accept that there is an injury."

The plaintiff's own evidence is the only explanation of the result; namely the jury returning a verdict finding for defendant and against plaintiff. Plaintiff's testimony was self-contradictory and was, in some material matters, impeached. The jury could have found plaintiff unworthy of belief and his alleged injuries feigned. The testimony of plaintiff's doctors was such that the jury could not have been compelled to accept it. Plaintiff's argument that the testimony concerning a "causal relation between plaintiff's condition of ill being and the accident" is

"uncontradicted" is not supported by our examination of the record. From our examination of the record, we cannot say as a matter of law that the jury's verdict was against the manifest weight of the evidence.

Plaintiff also argues that the risk of colliding with the rear of plaintiff's vehicle included the risk of precipitating plaintiff's alleged "traumatic neurosis" even if the latter was an unforeseeable consequence.

Plaintiff premises this argument on the opinion expressed by Dr. Harry Garner that there was a causal relationship between the accident which plaintiff experienced and the subsequent symptom syndrome and disability which Dr. Garner characterized as a "traumatic neurosis."

Plaintiff states that "it is true that plaintiff's history as a refugee from Poland, via Israel, after a long time in a Nazi concentration camp, the change in his economic condition on arrival in this country and other personal factors of long standing, may have predisposed him to the neurosis" but argues that this accident "triggered" the neurosis.

Plaintiff had the burden to establish a causal relationship between defendant's negligence and his injury by the preponderance of evidence and with reasonable certainty. (*Daly v. Bant*, 122 Ill.App.2d 233, 258 N.E.2d 382.) In the instant case, whether plaintiff's alleged neurosis was caused by some other "stressful situation" or whether it was, as plaintiff contends precipitated by the accident, was a question of fact to be resolved by the jury. As has been frequently stated, the jurors are the sole judges of the credibility of the witnesses and the weight to be given to their testimony and from our review of the record, we cannot say that the jury's finding was against the manifest weight of the evidence.

Plaintiff argues that if the jury did not believe that his neurosis was caused by the accident, it could not disbelieve his proven special damages and out-of-pocket expenses. He concedes, *arguendo*, that the jury was not obliged to believe that plaintiff's emotional disorder was a traumatic neurosis caused by the accident but argues that there was other evidence of plaintiff's injury which makes the jury's verdict untenable.

Plaintiff's hospital and medical bills were not introduced into evidence. The only testimony concerning plaintiff's expenses was that of Dr. Alpert that he rendered a bill for services to plaintiff which was "around $850.00, $860.00" and that in his opinion this was "a fair and reasonable amount based on relative and like charges in the City of Chicago by other doctors." Neither party attempted to segregate the portion of Dr. Alpert's bill attributable to the alleged "neurosis" apart from the treatment of plaintiff's alleged "stiff neck and blow to plaintiff's head."

From our examination of the record, the jury may have concluded that in fact plaintiff did not strike his head and that he did not have a stiff

neck. At the trial plaintiff testified that after he struck his head on the windshield, he had a bruise in the right forehead area and that he believed the bruise was discolored and the bump or mark would be visual to persons observing him after the accident. Plaintiff's testimony is rebutted by other witnesses, including plaintiff's son, who testified that after the accident they observed no marks on the plaintiff. Moreover, Dr. Alpert's testimony that plaintiff sustained a "stiff neck" as a result of the accident was impeached to a degree by the doctor's admission that he had signed and approved a summary of the hospital records concerning plaintiff dated May 16, 1965 which stated plaintiff's neck was "supple and non-tender."

As this court stated in *Jeffrey v. Chicago Transit Authority,* 37 Ill.App.2d 327, 335, 185 N.E.2d 384, 388:

> "If the jury did not disbelieve the plaintiffs and if their evidence was not discredited we presume verdicts would have been returned commensurate with their testified pains and losses."

We cannot say that the jury's determination was against the manifest weight of the evidence and can perceive no reason to warrant overturning the verdict.

Therefore, the judgment is affirmed.

Judgment affirmed.

GOLDBERG and EGAN, JJ., concur.